The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Robert Paul THIRET,
Defendant-Appellee.

No. 84SA107.

Supreme Court of Colorado,
En Banc.

July 16, 1984.

Robert R. Gallagher, Jr., Dist. Atty., John C. Jordan, Deputy Dist. Atty., Littleton, for plaintiff-appellant.

1. § 18–2–101 and § 18–3–102, 8 C.R.S. (1978).

2. § 18–3–302, 8 C.R.S. (1983 Supp.).

3. § 18–6–401(1) and (7), 8 C.R.S. (1983· Supp.).

David F. Vela, State Public Defender, Craig L. Truman, Thomas M. Van Cleave, III, Deputy State Public Defenders, Denver, for defendant-appellee.

QUINN, Justice.

The People filed this interlocutory appeal, pursuant to C.A.R. 4.1, to challenge a ruling of the district court suppressing various items of evidence including the following: a photograph and two rolls of film seized by law enforcement officers during an alleged consent search of the defendant's home; the defendant's automobile impounded by the police while it was parked outside the defendant's home and any evidence obtained from a subsequent search of the vehicle; and statements made by the defendant to law enforcement officers in his home and later at the district attorney's office following a polygraph examination. We affirm in part, reverse in part, and remand for further proceedings.

## I.

On September 12, 1983, an information was filed in the Arapahoe County District Court charging the defendant, Robert Paul Thiret, with attempt to commit first degree murder,[1] two counts of second degree kidnapping,[2] child abuse,[3] sexual assault on a child,[4] and crime of violence.[5] The defendant filed several motions to suppress which were heard by the court over several days and decided on April 23, 1984.

A record of the suppression hearing reveals the following pertinent facts. At approximately 12:45 p.m. on August 22, 1983, a three-year-old girl was abducted outside her home in Sheridan, Colorado. Sergeant Louis Florez of the Sheridan Police Department responded immediately to the scene and interviewed witnesses. Marvin Edler, a painter who had been sitting outside his worksite on his lunch break, said that he

4. § 18–3–405, 8 C.R.S. (1978 and 1983 Supp.).

5. § 16–11–309, 8 C.R.S. (1983 Supp.).

saw a car parked across the street and observed the driver talking to two children sitting on the curb. A small blonde-haired child then entered the car which immediately drove off. According to Sergeant Florez, Edler described the car as "a tannish brown or possible orange Datsun with ... black block letters Datsun on the bottom half of the car." Paul Weaver, a neighbor, observed an orange Datsun with a black vinyl top, black letters on the bottom of the car, and a license plate consisting of the letters "ADC" or "ADV" with three numbers, one of which might have been a "2." Sergeant Florez broadcast these descriptions over his radio.

The following morning, August 23, John Huyler, an F.B.I. agent, received a telephone call from Wuanita Zappas regarding the abduction of the child. Zappas informed Huyler that a car matching the description of the abduction vehicle had been seen in front of her daughter and son-in-law's home in the 6400 block of Spotswood in Denver during the first week in July, and that the driver had been talking to her granddaughter who was playing in the yard. Stanley Ellis, her son-in-law, noted the license plate number and turned it over to the Littleton Police Department. Agent Huyler followed up on Zappas' phone call by verifying the information with Ellis and then checking the records office at the Littleton Police Department. He learned that the license plate number reported by Ellis was ADV627. Additional investigation revealed that the car carrying that plate number was registered to the defendant, who resided at 7900 West Layton in Denver.

Agent Huyler and another F.B.I. agent, Brian Jovick, along with two other agents, drove in an unmarked vehicle to the defendant's address in a large townhouse complex and arrived in the neighborhood at about noon on August 23. Upon arrival they observed in the driveway an orange-brown Datsun with a black vinyl top and the license plate number ADV627. Huyler and Jovick went to a phone booth at the complex to call the Sheridan Police Department. Chief Joseph Stephenson of the Sheridan Police Department and two Sheridan detectives, Richard Harris and Michael Anthony, arrived in an unmarked car at the entrance to the complex shortly thereafter. All were dressed in plain clothes. Agents Huyler and Jovick and the three Sheridan officers then drove to the defendant's house and knocked on his door.

When the defendant came to the door the F.B.I. agents and the Sheridan officers identified themselves. Agent Jovick asked the defendant if he owned the car parked in the driveway, and the defendant replied that he did. Jovick told him that a young girl had been abducted the previous day in a similar car, that they would like to talk to him about a kidnapping, and asked if they could come in. The defendant said "come on in" and opened the door. Chief Stephenson then asked the defendant if he minded if they "looked around the house," to which the defendant replied, "No, go ahead," whereupon the two F.B.I. agents and the three Sheridan police officers entered the home.

Once inside, Chief Stephenson, Detective Anthony and Agent Huyler proceeded to search the house, looking for the child and a red shirt that she had been wearing at the time of the abduction. They were joined shortly thereafter by Detective Michael Glidden of the Sheridan Police Department. It took the four officers approximately forty-five minutes to search the entire three-bedroom house from the top floor to the basement. Chief Stephenson, in describing the search, testified that they "looked through every area of the house," "removed or lifted up [every] item that a child this size could have been under," and looked under "suitcases, trunks, boxes, cardboard boxes, or anything of that nature." The only items seized were a photograph of a house [6] and two rolls of film.

---

6. The suppression testimony was in some conflict as to whether one or two photographs were taken. There is also a discrepancy in the record with regard to the house depicted in the photograph. One officer testified that it portrayed a house semi-finished with aluminum siding, lo-

The photograph was taken from the top of a dresser and the two rolls of film from the top of a stereo speaker.

While the search was being conducted, Agent Jovick interviewed the defendant in the living room in the presence of Sheridan Detective Harris. Jovick asked the defendant some general questions about himself, his girlfriend, the existence of any past or present criminal charges, where he worked, and what he had done the day before. In response to the defendant's question about the nature of the inquiry, Jovick told him that a three-year-old girl had been abducted the previous day and that the defendant's car matched the description of the abduction vehicle. Jovick then said, "[W]e are interested in finding the girl since she has not been found." The defendant stated that on the previous day at the time of the abduction he had been taking a nap, but that his car had been in the driveway with the keys in it. Finally, Jovick asked the defendant if he would be willing to take a polygraph test to clear himself of suspicion. After questioning Jovick about the nature of the test, the defendant stated that he would take it. The entire interview at the defendant's home lasted between one-half hour and an hour. At no time was the defendant advised of his *Miranda* rights.[7] At Chief Stephenson's request, Detective Anthony then brought the defendant to the Arapahoe County District Attorney's office for the polygraph examination.

At the district attorney's office the defendant was advised of his *Miranda* rights and signed a written waiver. He also consented in writing to searches of his house and car. Upon completion of the polygraph examination and further questioning, the defendant was transported home with the understanding that he would return the following day for further testing.

Earlier that day, while the defendant was being interviewed at his home by Agent Jovick, Paul Weaver had been brought to the scene by Sheridan police officers. He identified the defendant's car as the one involved in the abduction. Five minutes after Detective Anthony drove away with the defendant to the district attorney's office for the polygraph examination, Sheridan police officers arranged for the towing of the defendant's Datsun to a storage bay at Bob's Towing at 4300 South Federal Boulevard, one block from the Sheridan Police Department building. Later that afternoon, pursuant to the written consent executed by the defendant, the Datsun was searched by crime lab personnel from the Arapahoe County Sheriff's Office. The record does not disclose what evidence, if any, was found in the search.

On the next day, August 24, the defendant was picked up by a Sheridan police officer and was transported to the district attorney's office for a polygraph examination. At 12:36 p.m. the defendant was advised of his *Miranda* rights and executed a written waiver of those rights. Following the polygraph examination the defendant was again advised of his rights at 4:04 p.m. and executed another written waiver. Charles Grant, the polygraph examiner, questioned the defendant for an hour, and the defendant indicated that he wished to go home.

At about 5:00 p.m., while Grant was arranging for the defendant's transportation home, he placed the defendant in the office of Robert Sexton, an investigator with the district attorney's office. Without readvising the defendant of his *Miranda* rights, Sexton began discussing the abduction with him. Shortly after the conversation began, Sexton, with the defendant's permission, closed his office door. A few minutes later the officer assigned to drive the defendant home came in and told him to let him know when he was ready to leave. The defendant, according to Sexton, ac-

cated two and a half blocks from the victim's Sheridan home, whereas another officer stated that the photograph depicted a house located near the Ellis residence in Denver. Our result in this case, of course, is the same regardless of the number of photographs taken in the seizure.

7. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

knowledged the officer's statement either by nodding his head or by saying "okay" or "yes." Sexton and the defendant then resumed their conversation in the office. Sexton testified that the defendant "[t]alked about cleaning his car the day before, what he had done the day of the kidnapping or when [the child] was missing, what he may have been doing in that area [and] who he was with that day." Sexton asked the defendant where he believed the place would be to look for a missing person. The defendant replied that Bear Creek Park would be the place to look. The interview lasted about one and one-half hours, at the conclusion of which the defendant was driven home.

The district court suppressed the evidence obtained in the August 23 search of the defendant's home because, in its view, neither the F.B.I. nor the Sheridan Police Department had jurisdiction to conduct a search of the home under the circumstances of this case, and also because the search exceeded the scope of the defendant's consent. The court also suppressed any evidence obtained as a result of the August 23 seizure and search of the defendant's Datsun because, once again, the Sheridan Police Department lacked jurisdiction to seize the defendant's vehicle outside the territorial limits of Sheridan, and because the search was not justified under the "inventory search" exception to the warrant requirement. Also suppressed was a statement made by the defendant at his home to Agent Jovick because, in addition to the F.B.I.'s purported lack of authority to conduct an investigation into the kidnapping, the defendant's statement was the result of a "custodial interrogation" that was not preceded by a *Miranda* warning and waiver. Finally, the court granted the defendant's motion to suppress his statement to Investigator Sexton following his August 24 polygraph examination, ruling that the defendant was in police custody at this time and had not been readvised of his *Miranda* rights immediately prior to the interview.

## II.

Because the district court partly based its suppression ruling on the determination that both the F.B.I. and the Sheridan Police Department "were acting out of their jurisdiction" and without authority in participating in the activities resulting in the acquisition of evidence against the defendant, we consider as a preliminary matter these "jurisdictional" aspects of the court's ruling.

### A.

In ruling that the F.B.I. lacked authority to interrogate the defendant and to participate in the search of his home on August 23, 1983, the court relied on 18 U.S.C. § 1201(b) (1982), a portion of the federal kidnapping statute, which states that "the failure to release the victim within twenty-four hours after [s]he shall have been unlawfully seized ... shall create a rebuttable presumption that such person has been transported [in] interstate or foreign commerce." The court reasoned that this statute prohibited any investigatory activity on the part of the F.B.I. until twenty-four hours had elapsed since the abduction on August 22. We disagree with the court's analysis.

The F.B.I. is charged with the duty of investigating suspected violations of federal law. *Kenyatta v. Kelly*, 375 F.Supp. 1175 (E.D.Pa.1974); *United States v. Blackfeet Tribe of Blackfeet Indian Reservation*, 364 F.Supp. 192 (D.Mont.1973). This investigative responsibility is not limited to completed federal offenses, but extends to incipient criminal behavior as well. As the court said in *Kenyatta*, 375 F.Supp. at 1177, "[c]oncomitant with the duty to investigate the criminal must exist the privilege to investigate the suspect, for until information has been acquired, classified, analyzed, and disseminated neither guilt nor innocence can be even surmised." We do not read 18 U.S.C. § 1201(b) as limiting the F.B.I.'s broad investigatory powers. In our view, that provision merely addresses the evidentiary presumption applicable to one element of the crime of kidnapping,

namely, transportation in interstate or foreign commerce. The court's construction of 18 U.S.C. § 1201(b) as a jurisdictional prohibition against F.B.I. investigatory activity at the defendant's home was clearly flawed.

### B.

The court ruled that the Sheridan Police Department lacked authority to search the defendant's home and to seize his vehicle because both the home and the vehicle were located inside Denver and outside of the territorial limits of Sheridan. In so ruling, the court relied on *People v. Lott,* 197 Colo. 78, 589 P.2d 945 (1979), and *People v. Hamilton,* 666 P.2d 152 (Colo.1983). The court's reliance on *Lott* and *Hamilton* was misplaced.

In *Lott* we held that an extraterritorial warrantless arrest made in the absence of exigent circumstances was invalid. We expanded this rule in *Hamilton* to include an arrest pursuant to warrant, holding that in the absence of fresh pursuit an officer making an extraterritorial arrest must obtain the assistance of officers with appropriate arresting authority. *Lott* and *Hamilton,* however, are confined to considerations relating to the authority of the peace officer to make an extraterritorial arrest in the absence of fresh pursuit in accordance with the provisions of section 16–3–106, 8 C.R.S. (1978). They do not prohibit an officer from entering another jurisdiction to pursue investigative leads concerning a crime committed within his jurisdiction. Moreover, the mere fact of an unlawful extraterritorial arrest is not the equivalent of an unconstitutional seizure of the person. As we stated in *Hamilton,* "the sanction of the exclusionary rule is designed to effectuate guarantees against deprivation of constitutional rights," and violations of statutory proscriptions against extraterritorial arrest "are not per se violations of constitutionally protected rights." 666 P.2d at 156. *See also United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *People v. Wolf,* 635 P.2d 213 (Colo.1981).

In contrast to the facts in *Lott* and *Hamilton,* no arrest of the defendant was effectuated by the Sheridan officers at the defendant's home in Denver. Furthermore, unlike *Lott* and *Hamilton,* the Sheridan officers were confronted in this case with exigent circumstances. A three-year-old child had recently been abducted, her life could well have been in danger, and the Sheridan police were engaged in efforts to determine her whereabouts. In responding to the call from the F.B.I., the officers took the most plausible course of action available to them—to join the F.B.I. agents at the defendant's home in order to find out what, if anything, the defendant might know about the whereabouts of the child. Finally, even if the investigative measures taken by the Sheridan officers had included an arrest, such an arrest, as long as based on probable cause, would not have been improper under *Lott* or *Hamilton* because the Sheridan police officers were accompanied by F.B.I. agents who had both investigative and arresting authority in Denver for federal offenses. *See People v. Florez,* 680 P.2d 219 (Colo.1984); *People v. Schultz,* 200 Colo. 47, 611 P.2d 977 (1980). Under these circumstances, the validity of any search and seizure at the defendant's home must be resolved, not on the mere fact that it took place outside the territorial limits of Sheridan, but rather on the basis of controlling constitutional standards relating to search and seizure.

### III.

In suppressing the photograph and two rolls of film seized during the search of the defendant's home on August 23, 1983, the district court ruled that the defendant's oral consent to "look around" was not a consent to search and that the subsequent seizure was thus beyond the scope of the consent given by the defendant. We agree with the court's resolution of this issue.

Warrantless searches are per se unreasonable unless they satisfy an exception to the warrant requirement. *E.g., Colorado v. Bannister,* 449 U.S. 1, 101 S.Ct.

42, 66 L.Ed.2d 1 (1980) (per curiam); *People v. Meyer*, 628 P.2d 103 (Colo.1981). One such exception is a search conducted pursuant to a valid consent. No search warrant is required where consent, in light of the totality of circumstances, has been freely and voluntarily given. *E.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *People v. Carlson*, 677 P.2d 310 (Colo.1984); *People v. Helm*, 633 P.2d 1071 (Colo.1981). Voluntariness in this context means that the consent was not the result of duress or coercion, express or implied, or any other form of undue influence exercised against the defendant. *E.g., Schneckloth*, 412 U.S. at 248, 93 S.Ct. at 2058; *People v. Elkhatib*, 632 P.2d 275 (Colo.1981); *People v. Torand*, 622 P.2d 562 (Colo.1981). Even when consent has been voluntarily given, however, a warrantless search made pursuant thereto must be limited to the scope of the consent. *Torand*, 622 P.2d at 565; *People v. Billington*, 191 Colo. 323, 552 P.2d 500 (1976).

▬▬▬ In this case the seizure of the photograph and two rolls of film exceeded the scope of the consent. What the defendant agreed to was to permit the officers to "look around" the house. A "look around" connotes a casual observation of the premises. The "look around," however, consisted of a search of the defendant's three bedroom house by four officers over a period of forty-five minutes, including an inspection of piles of clothes and debris, and an examination of drawers, boxes and other closed containers. This extensive type of search was far in excess of the "look around" authorized by the defendant, *see, e.g., United States v. Dichiarinte*, 445 F.2d 126 (7th Cir.1971); *Torand*, 622 P.2d 562; *People v. Sanders*, 44 Ill.App.3d 510, 3 Ill.Dec. 208, 358 N.E.2d 375 (1976); *State v. Cuzick*, 21 Wash.App. 501, 585 P.2d 485

(1978), and the seizure of the photograph and film in the course of the search was invalid.[8] Nor does the defendant's subsequent execution of a written consent to search his home, made while he was at the district attorney's office, serve to validate the seizure that preceded the written consent. An allegedly consensual seizure must stand or fall on the basis of the consent pre-existing the seizure. *See generally Schneckloth*, 412 U.S. 218, 93 S.Ct. at 2043; *Torand*, 622 P.2d 562. We therefore affirm the suppression ruling with regard to the photograph and the two rolls of film seized in the defendant's home.

## IV.

▬▬▬ We next address the seizure and subsequent search of the defendant's Datsun automobile on August 23, 1983, by Sheridan police officers. The district court ruled that the seizure was illegal as outside the territorial limits of Sheridan, and that the subsequent search was not a valid inventory search. We agree that the purpose of the seizure and search of the car was not to hold the contents of the vehicle for safekeeping and to return them to the defendant on completion of the polygraph examination, but rather was to gather incriminating evidence against him. The seizure and search of the car, therefore, cannot be justified under the inventory search exception. *See People v. Counterman*, 192 Colo. 152, 556 P.2d 481 (1976). The district court, however, failed to consider the applicability of any other exception to the warrant requirement. We find persuasive in this respect the People's contention that the Sheridan police officers validly seized and searched the defendant's vehicle under the "automobile exception" to the warrant requirement.

---

**8.** The People do not claim that the seizure of the photograph and film was justified under the "plain view" doctrine, nor will the record support such a determination. In order to establish a "plain view" seizure, it was incumbent on the People to present testimony showing that the officers seized the photograph and films because they had present knowledge of facts

establishing a reasonable nexus between these articles and criminal activity on the part of the defendant. *E.g., Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *People v. Franklin*, 640 P.2d 226 (Colo.1982); 2 W. LaFave, *Search and Seizure* § 8.1 at 629–30 (1978). No such testimony was presented at the suppression hearing.

Beginning with *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the automobile exception has been an accepted part of search and seizure doctrine. *E.g., United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Bannister,* 449 U.S. 1, 101 S.Ct. 42; *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *People v. Barton,* 673 P.2d 1005 (Colo.1984); *People v. Velasquez,* 641 P.2d 943 (Colo.1982); *People v. Meyer,* 628 P.2d 103. The exception is predicated on the inherent mobility of motor vehicles and the diminished expectation of privacy in an object designed exclusively as a means of transportation. *E.g., Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion); *People v. Smith,* 620 P.2d 232 (Colo.1980). Thus, "the police may conduct a warrantless search of a motor vehicle if: (1) there is probable cause to believe that it contains evidence of a crime; and (2) the circumstances create a practical risk of the vehicle's unavailability if the search is postponed until a warrant is obtained." *Meyer,* 628 P.2d at 106. When these factors are present, the car may either be searched immediately without a warrant or seized for a later warrant search, because "[t]he probable cause factor" which developed at the scene "still obtain[s] at the station house." *Chambers,* 399 U.S. at 52, 90 S.Ct. at 1981; *see also Bannister,* 449 U.S. at 3, 101 S.Ct. at 43; *Texas v. White,* 423 U.S. 67, 68, 96 S.Ct. 304, 305, 46 L.Ed.2d 209 (1975).

Applying the criteria to the facts of this case, we are satisfied that the seizure and subsequent search of the defendant's car on August 23 met the requirements of the automobile exception. The Sheridan police officers were legitimately at the defendant's home in an effort to locate the victim of a kidnapping that occurred in Sheridan. *See* Part IIB, *supra.*

While this investigation was being conducted and the defendant was being interviewed at his home, Paul Weaver identified the defendant's Datsun, which was parked outside the home, as the car involved in the abduction. This identification supplied the Sheridan officers with probable cause to believe not only that the vehicle was the instrumentality of the kidnapping but that it also would likely contain some evidence of the child's former presence inside the vehicle. Although the vehicle was seized while the defendant was temporarily away from home while taking a polygraph examination at the district attorney's office, he had nonetheless been alerted that his Datsun matched the description of the vehicle used the previous day in the kidnapping. The car was still mobile and, if not seized, could have been driven off by the defendant upon his return or by someone acting under his direction prior to his return, with resulting loss to the police of both the vehicle and its contents. The mobility of the vehicle thus created a sufficient exigency to warrant immediate seizure. Since the initial seizure was lawful, the later search of the vehicle at Bob's Towing was equally lawful.[9] *Chambers,* 339 U.S. 42, 90 S.Ct. 1975.

## V.

We next consider the propriety of the district court's suppression of the statement made by the defendant at his home on August 23, 1983, to Agent Jovick. In ruling that Agent Jovick's interrogation constituted "custodial interrogation" within the meaning of *Miranda* and that the absence of a *Miranda* warning required the suppression of the defendant's statement, the trial court relied on the presence of Detective Harris in the living room, finding that his presence "acted as a restraint," and on the presence of other officers in or about the home at this time.[10] The stan-

---

9. Because we uphold the search of the defendant's vehicle under the automobile exception, we need not consider the written consent for an automobile search which he executed while at the district attorney's office.

10. In its ruling the court stated, in pertinent part:

"In the living room Agent Jovick and Mr. Thiret sat on the chairs, Mr. Thiret was not in hand cuffs, nor was he physically restrained while being interrogated by Agent Jovick.

dard employed by the court in making this determination was unduly restrictive because, rather than considering the totality of circumstances surrounding the interrogation, the court focused essentially on one circumstance only, namely, the number of officers at the scene. In this respect the court erred.

 Interrogation is "custodial" when it is "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The question of custody turns on an objective assessment of whether a reasonable person in the defendant's circumstances would have believed that he was free to leave the officer's presence. *See People v. Johnson,* 671 P.2d 958 (Colo.1983); *People v. Parada,* 188 Colo. 230, 533 P.2d 1121 (1975); *People v. Algien,* 180 Colo. 1, 501 P.2d 468 (1972). In making this determination a court must consider the totality of circumstances surrounding the interrogation, including such factors as the following: the time, place and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and general demeanor; the length and mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions. *See Johnson,*

671 P.2d at 962; *People v. Rodriquez,* 645 P.2d 857, 860 (Colo.App.1982). The district court's failure to consider the totality of circumstances in resolving the issue of custodial interrogation requires us to reverse the suppression of the defendant's statement to Agent Jovick and to remand for a determination of this issue under the appropriate standard.

### VI.

We turn to the suppression of the defendant's statement to Investigator Sexton on August 24, 1983, after the defendant had completed the polygraph examination at the district attorney's office. The district court, concluding that the defendant was in the "custody of police officials" when he was interviewed by Investigator Sexton, suppressed the defendant's statement because Sexton had not readvised him of his *Miranda* rights. We reject the court's resolution of this issue.

 It cannot be disputed that the defendant went voluntarily to the district attorney's office to take part in the polygraph examination. He was not under arrest, nor was his freedom to depart restricted. In fact, shortly after the defendant began conversing with Investigator Sexton, another officer told the defendant to let him know when he was ready to leave. The defendant responded to the officer by indicating that he would do so. The record is devoid of any evidence to support the district court's determination that the defendant was "in custody" at the time of the Sexton interview. *See Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (where suspect went voluntarily to police station for question-

The presence of Detective Harris standing in the room while the interrogation was proceeding acted as a restraint.

"Though Agent Jovick stated Mr. Thiret was free to leave at any time[,] this statement is negated by the fact of Detective Harris' presence, the presence of at least three other law enforcement officers in the home, two F.B.I. agents positioned at the rear of the home, and the blockage of Mr. Thiret's automobile by Agent Jovick's and Chief Stephenson's automobile."

There is nothing in the suppression testimony, however, indicating that the defendant was aware of the presence of Agent Jovick's or Chief Stephenson's automobiles. Nor is there any evidence showing that the defendant was aware of the presence of the F.B.I. agents at the rear of his home. We therefore do not consider the location of Agent Jovick's and Chief Stephenson's automobiles or the presence of the two F.B.I. agents at the rear of the defendant's home as sufficiently significant to alter our analysis.

ing, was informed that he was not under arrest and left after interview without hindrance, questioning was not custodial for purposes of *Miranda* warnings).[11]

In summary, we affirm the suppression of the photograph and two rolls of film seized from the defendant's home. We reverse all other aspects of the suppression ruling and remand the case to the district court with directions to determine, in accordance with Part V of this opinion, the constitutional admissibility of the defendant's statement to Agent Jovick.

---

**11.** Moreover, even if the Sexton interview had been custodial, which it was not, it would not necessarily follow that Sexton was obligated to administer a fresh set of warnings to the defendant before talking to him. *See Brown v. Tard,* 552 F.Supp. 1341 (D.N.J.1982); *People v. Quirk,* 129 Cal.App.3d 618, 181 Cal.Rptr. 301 (1982); *Grimes v. State,* 454 N.E.2d 388 (Ind.1983); *Commonwealth v. Silva,* 388 Mass. 495, 447 N.E.2d 646 (1983). The critical considerations in a case of delayed custodial interrogation following a previously administered *Miranda* warning are whether the circumstances surrounding the prior warning sufficiently placed the defendant on notice of the continuing nature of his constitutional rights during any ensuing interrogation and whether any subsequent statement was the result of the defendant's knowing, voluntary and intelligent waiver of his rights. *E.g., Brown,* 552 F.Supp. at 1349; *Quirk,* 129 Cal.App.3d at 629, 181 Cal.Rptr. at 306; *Silva,* 388 Mass. at 502, 447 N.E.2d at 652. In this case the defendant was advised of his *Miranda* rights at 12:36 p.m. and 4:04 p.m. on August 24, 1983, and on each occasion he acknowledged in writing that he understood his rights and expressly waived them. The second advisement at 4:04 p.m. occurred within one hour of his interview with Investigator Sexton. The record is simply barren of any evidence to reasonably support the inference that the defendant, when he met with Sexton at approximately 5:00 p.m., had forgotten or no longer understood the rights which he expressly acknowledged and waived on two prior occasions, the last of which was within one hour of the interview in question.