Nicholas J. JONES, Petitioner,

v.

The PEOPLE of the State of Colorado, Respondent.

The PEOPLE of the State of Colorado, Petitioner,

v.

Nicholas J. JONES, Respondent.

Nos. 83SC401, 83SC414.

Supreme Court of Colorado, En Banc.

Jan. 13, 1986.

Rehearing Denied Jan. 31, 1986.

David F. Vela, State Public Defender, Shelley Gilman, Special Deputy State Public Defender, Denver, for Nicholas J. Jones.

Duane Woodard, Atty. Gen., Charles B. Howe Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Maureen Phelan, Asst. Atty. Gen., Denver, for the People.

ERICKSON, Justice.

Defendant, Nicholas J. Jones, was convicted of first-degree murder[1] and aggravated robbery[2] following a jury trial. In *People v. Jones*, 677 P.2d 383 (Colo.App. 1983), the court of appeals reversed the judgments of conviction and remanded the case for a new trial. We granted certiorari to review the decision of the court of appeals.[3] We affirm in part, reverse in part, and remand to the court of appeals with directions to reinstate the judgments of conviction against the defendant.

I.

On August 30, 1979, the body of Angel Santiago was found in Plateau Creek near Grand Junction, Colorado. He had been shot twice in the head. Santiago's wrists were tied behind his back, and his ankles were bound together. Santiago had left his home in Downey, California on August 23, driving a white 1973 Pontiac LeMans, en route to New York. A pathologist esti-

---

1. § 18-3-102, 8 C.R.S. (1978).

2. § 18-4-302, 8 C.R.S. (1978).

3. Both the prosecution and the defendant filed petitions for certiorari. We granted both petitions, and the two cases were consolidated for purposes of this opinion.

mated Santiago's date of death between August 24 and August 26.

On September 7, at approximately 1:30 a.m., the defendant, accompanied by a male companion, checked into the Holiday Inn in Manchester, New Hampshire. The defendant registered under the name of Angel Santiago and used a VISA credit card bearing Santiago's name. Approximately one-half hour later, the defendant appeared in the hotel lobby and told the desk clerk that his companion had stolen his wallet, credit cards, money, and car while he was taking a shower. Officer Eugene Cook of the Manchester Police Department was on routine patrol on the morning of September 7 and happened to walk into the Holiday Inn while the defendant was talking to the clerk. The clerk referred the defendant to Officer Cook, and the defendant, still identifying himself as Angel Santiago, reported the theft to Officer Cook. The defendant said that the car was a white 1973 Pontiac with a California registration. Officer Cook obtained the license plate number of the vehicle from the hotel registration card, and relayed the information to the police station. After talking with the defendant, Officer Cook returned to the police station and filed a written report. The vehicle information was entered on the police department's computer, and the police learned that the car had previously been reported stolen and was being sought in connection with a homicide in Colorado. The police then contacted Milo Vig of the Mesa County Sheriff's Department in Colorado. Vig said that his office was investigating the homicide of Angel Santiago and that the victim's car was missing.

Edmond LaBeouf, the Deputy Chief of Police of the Manchester Police Department, was apprised of the foregoing information when he reported for duty at 7:00 a.m. on the morning of September 7. He instructed Officer Cook and another officer to go to the Holiday Inn and ask the defendant to come to the police station to provide further information regarding the stolen car. The officers were not told to arrest the defendant. The officers went to the hotel and knocked on the door of the room registered to the defendant. Receiving no answer, the officers asked a hotel employee to open the door. The door was chained from the inside, but the officers could see the defendant asleep on a bed. They called out to the defendant and, when he awoke, told him that questions had arisen about the car he had reported stolen and that the police wanted him to come to the station to provide further information. The defendant agreed to go to the station with the officers and was transported there in the officers' patrol car.

At the stationhouse, Officer Cook introduced the defendant to Deputy Chief LaBeouf and Captain Michael Welch, who took the defendant to an interview room. LaBeouf informed the defendant that the car he had reported stolen had previously been reported stolen, and that the police wanted to clear up the matter. LaBeouf said it was standard policy to advise persons of their rights prior to questioning, and he gave the defendant an oral *Miranda* advisement. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant said he understood his rights and was willing to talk to the officers.

The officers asked the defendant to describe the route he had travelled from California to New Hampshire. The defendant responded that three weeks earlier he left Costa Mesa, California with a woman named Julie. The two drove up the West Coast through Oregon and Washington into Canada. They proceeded east across Canada to Montreal. When they reached Montreal, Julie flew back to California. In Montreal the defendant met a man named Steve whose last name was either Corbitt or Carlton. The two men drove south to New Hampshire and stopped at the Holiday Inn in Manchester. It was there that "Steve" stole the defendant's car and personal belongings.

At this point in the interview, LaBeouf told the defendant that an Angel Santiago had been shot to death in Colorado, and that the defendant had registered at the

Holiday Inn using a credit card bearing the name of Santiago. LaBeouf then asked the defendant to start over again beginning with his correct name. The defendant paused for a moment, stared at the officers, and said his real name was Nicholas Jones. He stated that he was an escapee from an Alabama prison where he had been serving a sentence for auto theft.

The defendant then gave a second account of his travels. He told the officers that he hitchhiked east out of Las Vegas, Nevada, and obtained a ride from a man named George between August 16 and August 19 in Utah. Several hours after picking the defendant up, the man said that he was going to give his car to the defendant and hitchhike back to California. The man said he would report the car as stolen a few weeks later. The defendant accepted the car and drove across country, eventually stopping in Montreal, where he met "Steve."

The interview lasted from 7:35 a.m. to 9:45 a.m. On the basis of the defendant's admission that he was an escapee from prison, he was arrested and incarcerated as a fugitive from justice.

The defendant was subsequently charged in the Mesa County District Court with the first-degree murder and aggravated robbery of Angel Santiago. At trial the prosecution called James Cooper, who testified that he met the defendant in Las Vegas in August 1979. Cooper said that the defendant stayed with him for several days and then departed without saying where he was going. Cooper also testified that he owned a .22 caliber "Bicentennial Edition" Ruger

handgun which he discovered missing shortly after the defendant left.

The evidence at trial also established that two days after the defendant's arrest in New Hampshire, police officers in Maine discovered Angel Santiago's car in the possession of and recently registered to Douglas Copley, who had obtained different license plates. Copley was subsequently identified as the man who checked into the Manchester Holiday Inn with the defendant. Copley led the officers to a handgun, which he had taken from the car and buried several miles from his home. At trial James Cooper identified the weapon as his .22 caliber Ruger handgun. A ballistics expert testified that two of the three shell casings found in the vicinity of Santiago's body were fired in Cooper's gun.

Other evidence against the defendant included the discovery of personal items belonging to Santiago in the defendant's room at the Manchester Holiday Inn. Objects belonging to Santiago were also found in a dumpster in Iowa. A fingerprint lifted from a cigarette carton in the dumpster was identified as the defendant's.

## II.

Prior to trial, the defendant filed a motion to suppress the statements he made to the Manchester police. At the suppression hearing, the defendant argued that the *Miranda* advisement given to him was insufficient because the officers did not inform him that he was suspected of criminal activity. The trial court denied the motion after finding that the defendant was properly advised of his rights, and that he voluntarily agreed to talk to the police officers.[4]

---

4. Specifically, the trial court found:
 [T]he evidence clearly indicates that the defendant was fully apprised of his rights, that the focus of the investigation had not centered upon the defendant, and that as a matter of fact, since the very beginning of the transaction, the night before when the defendant had approached the officer voluntarily to tell the officer that his automobile had been stolen and that he was reasonably sure that whoever stole it wasn't going to bring it back, and he had been deprived of his trousers and wallet and other indicia of identification. The refer-

ence to the registration card indicated that the defendant was utilizing the name of Santiago, and there was also an indication there that he had employed a VISA card, so when they started looking for the automobile, they found out that it was involved in some criminal activity, possibly theft, and possibly homicide, but the officers were faced with a situation in which they were trying to apprehend the thief of the defendant's car and trying to get all of the information they could about the car, and in the process of doing so, they discovered that it was on the National Identification

The court of appeals reversed the trial court's denial of the motion to suppress. The court stated:

Here, defendant was questioned by New Hampshire police after reporting the theft of his automobile. The questions asked by the policemen concerned the registration number and vehicle identification number of the automobile. According to New Hampshire authorities, *Miranda* warnings were given prior to this questioning as a matter of course. After double checking the information given them by defendant in response to their questions, the investigators had reason to believe defendant had participated in a homicide which occurred in Mesa County, Colorado. Before questioning defendant regarding the Colorado homicide, however, no further advisements were given.

*People v. Jones,* 677 P.2d at 383. Relying on *People v. Spring,* 671 P.2d 965 (Colo. App.1983), the court held that since the defendant was not advised that he was a suspect in the Colorado homicide, the waiver of his *Miranda* rights was invalid.

A.

■ Statements made by a defendant during custodial interrogation are admissible only if the prosecution establishes that the defendant was warned of his right to remain silent and his right to counsel prior to any questioning. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *People v. Spring,* 713 P.2d 865 (Colo.1985). The prosecution must also show that the defendant voluntarily, knowingly, and intelligently waived his *Miranda*

rights. *Id.* If the defendant's statements were preceded by an adequate *Miranda* advisement and a valid waiver, a third condition of admissibility is that the statements were voluntary. *People v. Pierson,* 670 P.2d 770 (Colo.1983); *People v. Fish,* 660 P.2d 505 (Colo.1983).

In this case, a threshold issue is whether the defendant, at the time of making the statements to the Manchester police, was in custody. The trial court made no specific findings on the custody issue, stating only that until the defendant admitted he was an escapee from an Alabama prison, he was not under arrest. The court of appeals also failed to address the issue. In its brief to this court, the prosecution asserts that the defendant was not in custody at the time he made the statements. Therefore, the prosecution contends the defendant's statements are admissible regardless of the adequacy of the *Miranda* warnings and the validity of the waiver.

■ In determining whether a person is in custody, the question is whether a reasonable person in the suspect's position would consider himself significantly deprived of his liberty. *People v. Black,* 698 P.2d 766 (Colo.1985); *People v. Thiret,* 685 P.2d 193 (Colo.1984). A court must consider the totality of circumstances under which the questioning was conducted, including:

[T]he time, place and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and general demeanor; the length and mood of the interrogation; whether any limitation of movement or

Computer, and that there was some criminal involvement other than that disclosed by theft; in the interrogation, the first story that he gave was inconsistent with the one that he gave secondly when they discovered or told him that they did not think that he was Santiago, and what was his name, and he gave them another statement and another name, and he did all of this voluntarily. Now, there was no probable cause to arrest, and there was no arrest which occurred prior to the time that the defendant admitted that he was an escapee from the Alabama institution. At

that time, he became amenable to arrest for that charge, and he was booked by the New Hampshire Police Department on that charge. He was not charged with a homicide, and there was no probable cause to arrest for homicide, and there was no probable cause to arrest for thievery in the light of the stories related to the police officers by the defendant. Those are the findings of fact that will be attributed specifically to the order of the court overruling the motions contained in the motion to suppress statements in number one.

other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions. *People v. Thiret*, 685 P.2d at 203. A person may be deemed "in custody" even if he has not been formally arrested by the police. *See People v. Johnson*, 671 P.2d 958 (Colo.1983). However, simply because questioning occurs at the police station does not mean that custodial interrogation has occurred. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *People v. Johnson*, 671 P.2d at 958.

Here, two police officers were instructed to bring the defendant into the police station for further questioning regarding the stolen automobile. The officers arrived at the defendant's hotel room at approximately 7:00 a.m. When they received no response to their knocking on the door, the officers summoned a hotel employee to open the door. The officers awakened the defendant and requested that he accompany them to the police station. Though the officers did not arrest the defendant, they did not tell him that he was free to decline their request. The officers led the defendant to their patrol car, and one sat in the back seat next to the defendant while the other drove the car to the station. At the stationhouse, the defendant was taken to an eight-by-eight foot interrogation room, given *Miranda* warnings, and questioned by two officers for two hours and ten minutes. There is no indication in the record that the officers ever told the defendant that he was free to leave. Only fifteen minutes after the interview began, the officers suggested to the defendant that the story he was telling them was a lie and that he should begin again. Under these circumstances, we believe that a reasonable person in the defendant's position would have· considered himself significantly deprived of his liberty. Therefore, the defendant's statements to the Manchester police were the product of custodial interrogation.

**B.**

We must next determine whether the defendant's statements were preceded by adequate warnings and a valid waiver. The trial court found that the defendant was fully apprised of his rights, and the court's finding has not been contested on appeal. The trial court also found that the defendant voluntarily agreed to talk to the police officers. The court of appeals reversed, holding that because the defendant was not advised that he was a suspect in the Santiago homicide, the waiver of his *Miranda* rights was invalid. The court relied on *People v. Spring*, 671 P.2d at 965. In *Spring*, agents of the Federal Bureau of Alcohol, Tobacco and Firearms arrested Spring in Kansas City, Missouri on charges of firearms violations. Prior to arresting Spring, the agents learned from an informant that Spring had admitted participating in a homicide in Colorado. The agents initially questioned Spring on the firearms charges but then asked him whether he had a criminal record. Spring said that he shot his aunt when he was ten years old and that he had a juvenile murder record. Asked if he had ever shot anyone else, Spring said "I shot another guy once." Upon further questioning, Spring denied ever having killed a man in Colorado.

When Spring was subsequently charged in the Colorado homicide, he moved to suppress his responses to the questions unrelated to the firearms charges. The trial court denied the motion, but the court of appeals reversed. The court held that the failure of the agents to inform Spring that he would be questioned about the Colorado homicide rendered the waiver of his *Miranda* rights invalid as to the questioning about the homicide.

We granted certiorari and affirmed the decision of the court of appeals to suppress the statements. However, we rejected the absolute rule adopted by the court of appeals, holding that "[w]hether, and to what extent, a suspect has been informed or is aware of the subject matter of the interro-

gation prior to its commencement is simply one factor in the court's evaluation of the total circumstances, although it may be a major or even a determinative factor in some situations." *People v. Spring,* 713 P.2d 865, 873 (Colo.1985) (citations omitted). We noted that a suspect's awareness of the subject matter of the questioning may come from sources other than the interrogating officers. Under the facts in *Spring,* we concluded that the failure of the federal agents to inform Spring that part of the questioning would focus on the Colorado homicide and the absence of any basis upon which Spring could have reasonably suspected that he was being interrogated on that matter constituted a sufficient basis for holding the waiver invalid. We said:

> Spring had no reason to suspect that the federal agent who had just arrested him in Kansas City during a firearms transaction that allegedly violated federal law would question him about a murder that occurred in Colorado, a crime not only in a distant jurisdiction but also outside of the normal purview of the federal Bureau of Alcohol, Tobacco and Firearms and totally unrelated to the transaction that gave rise to the arrest and interrogation.

At 874.

The court of appeals in *Spring* and in this case erroneously concluded that since the defendant was not told at the time he waived his *Miranda* rights that the interview would include questions about the homicide under investigation, the waiver was necessarily invalid. As we said in *Spring,* the applicable standard for determining the validity of the waiver is whether, in view of the totality of the circumstances, the waiver was voluntary, knowing, and intelligent. No single factor is determinative.

The defendant here reported to the Manchester police that his car had been stolen. In their investigation, the police learned that the car had previously been reported stolen and that its owner was the victim of a homicide. The police naturally desired to question the defendant about his claim of ownership to the vehicle and the circumstances surrounding his possession of the vehicle. The defendant was informed that the police wanted to clear up the confusion about the stolen car, and the defendant's acquisition and use of the car was in fact the subject of the interview. When the defendant's first account of his travels did not clarify the information known to the police, they told the defendant that an Angel Santiago had been killed and that the defendant was using a credit card bearing that name. The defendant then gave a second version of his travels in which he stated he acquired the car from "George" while hitchhiking in Utah.

■ This is unlike the factual scenario in *Spring.* The federal agents in *Spring* began questioning the defendant about firearms charges and then asked about an unrelated homicide. In this case, the Manchester police questioned the defendant about his claim that his car was stolen and that he was Angel Santiago. Questioning about the car necessarily involved the subject of the Santiago homicide, which was part of the same criminal episode involving possession of a stolen automobile owned by Angel Santiago. While the defendant in *Spring* had no reason to believe that the federal agents who questioned him about federal charges would also inquire about a Colorado homicide, the defendant here could have reasonably expected to be asked about the circumstances surrounding his ownership and possession of the car he had reported stolen. In our view, the defendant was adequately advised of the subject matter of the interview at the time he waived his *Miranda* rights.

■ An examination of the other circumstances surrounding the interview demonstrates that the defendant voluntarily, knowingly, and intelligently waived his constitutional rights. Before the interview the defendant was calm and friendly. He was not threatened or coerced. After being advised of his rights, the defendant said that he understood his rights and was will-

ing to talk to the police. The record contains ample evidence that the defendant was sufficiently intelligent to understand the nature of his rights and the consequences of waiving them. We therefore conclude that the defendant's waiver of his rights was voluntary, knowing, and intelligent.

### C.

■ We turn finally to the trial court's findings that the defendant's statements were voluntary. We will not disturb a trial court's findings of fact on voluntariness if the findings are supported by adequate evidence in the record. *People v. Pierson,* 670 P.2d at 770. Here, there is no evidence that the statements were obtained through promises, threats, violence, or any other improper influence. *People v. Cummings,* 706 P.2d 766 (Colo.1985). On the contrary, the record reveals that the defendant spoke to the officers freely and without reservation.

Accordingly, the court of appeals erred in ordering suppression of the statements made by the defendant to the Manchester police. The statements were voluntary and were made only after a proper *Miranda* advisement and waiver.

### II.

At the close of evidence the defendant requested that the trial court instruct the jury on second-degree murder. The court rejected the tendered instruction and submitted the case to the jury on first-degree murder and aggravated robbery. The court of appeals reversed, declaring that "[a]lthough the evidence in this case indicates that there was little validity to defendant's contentions which would reduce

his degree of culpability in the homicide, the [trial] court, nevertheless, had a duty to instruct the jury on this lesser offense." 677 P.2d at 385. The prosecution asserts that the trial court properly refused the instruction on second-degree murder because there was no evidence to support the instruction. We agree.

■ In a homicide case, a defendant is entitled to an instruction on a lesser included offense if there is any evidence, however slight, to establish the lesser included offense. *People v. Shaw,* 646 P.2d 375 (Colo.1982); *Coston v. People,* 633 P.2d 470 (Colo.1981). Even if the evidence offered on behalf of the defendant is unpersuasive, the trial court is under a duty to instruct on the lesser offense. *Id.* However, where there is *no* evidence to support the instruction, refusal to instruct on the lesser offense is not error. *Coston,* 633 P.2d at 470.

■ Section 18–3–103(1)(a), 8 C.R.S. (1978), provides that a person commits the crime of second-degree murder if "[h]e causes the death of a person knowingly, but not after deliberation." *Id.* The defendant did not present any evidence at trial which would permit the jury to find that he caused the death of Angel Santiago knowingly but not after deliberation, and we find none in the record.[5] The defendant's theory of defense was that he did not commit the homicide.[6] Because there is no evidence in the record to support the second-degree murder instruction tendered by the defendant, the trial court properly denied the instruction.

### III.

The court of appeals also held that the trial court erred in failing to sequester the

---

5. Indeed, the defendant did not call any witnesses and did not present any evidence at trial.

6. Although the defendant did not present any evidence at trial, his theory of the case may be gleaned from his cross-examination of prosecution witnesses. Additionally, the following colloquy took place between the defendant and the trial court at the close of the prosecution's case:
THE COURT: Your only defense is that you are not guilty; that you didn't do it.

THE DEFENDANT: Yes, your Honor.
THE COURT: That is what you have stated is your defense. The People have charged in the information alleging a robbery and murder and you have denied that you participated in either one of them.
THE DEFENDANT: Yes, your Honor.
THE COURT: That is your defense?
THE DEFENDANT: Yes, your Honor.

jury. The prosecution contends that although the jury should have been sequestered under Crim.P. 24(f), the defendant waived the requirement and has failed to establish any prejudice resulting from the trial court's failure to sequester the jury. We agree.

 At the time of trial, Crim.P. 24(f) provided:

**(f) Custody of Jury**

In noncapital cases jurors may be permitted to separate during all trial recesses after cautionary instructions by the court as to their conduct. After the case has been submitted to the jury for deliberation, and they have not been able to arrive at a verdict at a reasonable evening hour, they may be permitted to return to their homes to resume deliberations the next day at an hour appointed by the court. Continuous custody of the jury by the bailiff in noncapital cases shall only be upon express order of the court for good cause. *In capital cases, however, jurors shall remain in the bailiff's custody during all recesses from the time the jury is selected until discharged by the court.*[7]

*Id.* (emphasis added). A first-degree murder case is a capital case for purposes of Crim.P. 24(f). *People ex rel. Faulk v. District Court,* 667 P.2d 1384 (Colo.1983); *Tribe v. District Court,* 197 Colo. 433, 593 P.2d 1369 (1979). Rule 24(f), therefore, requires sequestration of the jury in a first-degree murder case, unless the requirement is waived by the defendant. *Tribe v. District Court,* 192 Colo. at 433, 593 P.2d at 1369; *Segura v. People,* 159 Colo. 371, 412 P.2d 227 (1966).

The court of appeals did not consider whether the defendant waived sequestration of the jury, stating only that *Faulk,* 667 P.2d at 1384, was "dispositive" of the sequestration issue. In *Faulk,* a first-degree murder case, both the defendant and the district attorney requested that the jury be sequestered. The trial court denied the request on the ground that sequestration was unnecessary because the jury was not death qualified. Relying on *Tribe v. District Court,* 197 Colo. at 433, 593 P.2d at 1369, we held that Crim.P. 24(f) requires sequestration of the jury in a first-degree murder case, regardless of whether the prosecution intends to qualify the jury for consideration of the death penalty or to seek the death penalty in the event of conviction. However, we explicitly recognized, as we had in *Tribe,* that a defendant may waive sequestration. We had no occasion in *Faulk* or *Tribe* to address the waiver issue because the defendants in both cases moved to sequester the jury.

By contrast, the defendant here did not request sequestration, did not object to the trial court's decision to allow separation, and did not complain when the jury separated on a number of occasions. The first time the defendant raised the issue of sequestration was in his motion for a new trial. We are thus squarely confronted with the question of whether the defendant's silent acquiescence to the separation of the jury constituted a waiver of the sequestration requirement.

In *Segura v. People,* 159 Colo. at 371, 412 P.2d at 227, a first-degree murder case, defense counsel agreed with the prosecutor that sequestration of the jury was unnecessary. The trial court permitted separation after giving admonitory instructions to the jury. The defendant was convicted. On appeal, he contended that the requirement

---

7. Crim.P. 24(f) has since been amended (effective January 1, 1984). The new rule provides:

**(f) Custody of Jury.**

(1) In all cases, in the court's discretion, jurors may be sequestered or permitted to separate during all trial recesses, both before and after the case has been submitted to the jury for deliberation. Cautionary instructions as to their conduct during all recesses shall be give to the jurors by the court.

(2) The jurors shall be in the custody of the bailiff whenever they are deliberating and at any other time as ordered by the court.

(3) If the jurors are permitted to separate during any recess of the court, the court shall order them to return at a day and hour appointed by the court for the purpose of continuing the trial, or for resuming their deliberations if the case has been submitted to the jury.

of sequestration in capital cases could not be waived. We held that "where defense counsel expressly agrees to separation of the jury in a capital case, error cannot be predicated on that procedure in the absence of a showing of prejudice to the defendant." *Id.* at 377, 412 P.2d at 231.

▮▮▮▮ Unlike the defendant in *Segura,* the defendant here did not expressly consent to separation of the jury. However, we believe that the defendant's failure to object to the separation during trial constituted a waiver of sequestration. The majority of courts hold that sequestration may be waived by reason of the defendant's failure to make a timely request or objection. *See, e.g., State v. Magwood,* 290 Md. 615, 432 A.2d 446 (1981); *Walters v. State,* 554 P.2d 862 (Okla.Crim.App.1976); *Jackson v. State,* 229 Ga. 191, 190 S.E.2d 530 (1972), *vacated on other grounds,* 409 U.S. 1122, 93 S.Ct. 944, 35 L.Ed.2d 254 (1973); *Flannery v. Commonwealth,* 443 S.W.2d 638 (Ky.1969); Annot., 72 A.L.R.3d 131, 180–186 (1976). The rationale underlying these cases is that a defendant should not be permitted to remain silent at trial while the jury is allowed to separate and then object to separation for the first time in his motion for a new trial. We agree with the rationale and hold that in the absence of a timely objection the failure to sequester the jury in a capital case is not reversible error unless the defendant establishes prejudice arising out of the separation of the jury.

▮▮▮▮ Here, the trial court found, after a lengthy hearing on the defendant's motion for a new trial, that the defendant was not prejudiced by the separation of the jury. We will not disturb the trial court's finding since it is supported by adequate evidence in the record. It therefore follows that the trial court's failure to sequester the jury does not constitute reversible error.

## IV.

On the morning of trial, the defendant moved for dismissal of the charges on the ground that he had been denied a speedy trial. The trial court denied the motion. The court of appeals affirmed.

The defendant entered pleas of not guilty to first-degree murder and aggravated robbery on March 3, 1980. A jury trial was set for July 28, 1980. On July 3, 1980, the defendant's attorney filed a motion to suspend proceedings pending a competency examination of the defendant at the Colorado State Hospital. The trial court denied the motion. The same day defendant successfully petitioned this court for a rule to show cause and a stay of pending proceedings. On September 29, 1980, we made the rule absolute and returned the case to the trial court with directions to order a competency examination. *Jones v. District Court,* 617 P.2d 803 (Colo.1980). The trial court thereupon ordered the defendant taken to the Colorado State Hospital for examination. On November 6, 1980, the psychiatric report was filed in the trial court. The first day after receipt of the report that defense counsel could be present in court was November 14. On that date, the trial court determined that the defendant was competent to proceed. Trial was set for and in fact commenced on January 12, 1981.

▮▮▮ A criminal defendant must be brought to trial within six months from the date he enters a plea of not guilty. § 18–1–405, 8 C.R.S. (1978 & 1985 Supp.); Crim.P. 48(b). Failure to comply with the speedy trial statute requires dismissal of the charges against the defendant. *People v. Bell,* 669 P.2d 1381 (Colo.1983); *Harrington v. District Court,* 192 Colo. 351, 559 P.2d 225 (1977). However, certain periods of time are not included in the computation of the six month period. Two exclusions are pertinent here:

> (6)(b) The period of delay caused by an interlocutory appeal whether commenced by the defendant or by the prosecution;
> . . . .
> (f) The period of any delay caused at the instance of the defendant.

§§ 18–1–405(6)(b) & (f).

The defendant concedes that the eighty-nine day period between July 3 and Sep-

tember 30 must be excluded from the speedy trial computation as a "period of delay caused by an interlocutory appeal." § 18–1–405(6)(b); *see People v. Ferguson,* 653 P.2d 725 (Colo.1982) (original proceeding initiated in good faith by either the defense or the prosecution constitutes an "interlocutory appeal" for purposes of the speedy trial statute). However, the defendant asserts that the period between October 1 and November 14 cannot be excluded. We disagree.

In our view, the thirty-seven day period between October 1 and November 6 was a period of delay "caused at the instance of the defendant." § 18–1–405(6)(f). We stated in *People v. Bell,* 669 P.2d 1381 (Colo.1983), that "[t]he key to interpreting category (6)(f) is to determine whether the defendant caused the delay. If the delay is caused by, agreed to, or created at the instance of the defendant, it will be excluded from the speedy-trial calculation made by the court." *Id.* at 1384. *See also People v. Murphy,* 183 Colo. 106, 515 P.2d 107 (1973) (in making speedy trial determination, delays at the request of or for the benefit of the defendant are chargeable to the defendant). Here, the competency examination was requested by defense counsel for the benefit of the defendant. The time necessary to complete the examination was thus properly chargeable to the defendant. *See* ABA *Standards for Criminal Justice* (1982) § 12–2.3(a) (period of delay resulting from examination and hearing on defendant's competency should be excluded from speedy trial computation).

We also believe the eight-day delay between the receipt of the psychiatric report on November 6 and the competency hearing on November 14 was attributable to the defendant. November 14 was the first day after receipt of the report that the defendant's attorney could be present in court. Scheduling delays to accommodate defense counsel are chargeable to the defendant. *People v. Bell,* 669 P.2d at 1381.

In view of the foregoing analysis, the defendant was not denied his right to a speedy trial. The defendant entered pleas of not guilty on March 3, 1980. Therefore, the original speedy trial deadline was September 3. Adding to that date the eighty-nine day delay occasioned by the original proceeding, the thirty-seven day delay necessary for the competency examination, and the eight-day scheduling delay to accommodate defense counsel, the new speedy trial deadline was January 15, 1981. The defendant's trial began on January 12, 1981.

V.

The judgment of the court of appeals is reversed, and the case is remanded to the court of appeals with directions to reinstate the judgment of conviction against the defendant.