The PEOPLE of the State of Colorado, Plaintiff/Appellant,

v.

Leslie Benjamin LaFRANKIE, Defendant/Appellee.

No. 92SA476.

Supreme Court of Colorado, En Banc.

Oct. 4, 1993.

Alexander M. Hunter, Dist. Atty., William F. Nagel, Chief Deputy Dist. Atty., Boulder, for plaintiff/appellant.

David F. Vela, Colorado State Public Defender, John Lucas, Deputy State Public Defender, Boulder, for defendant/appellee.

Justice SCOTT delivered the Opinion of the Court.

The People bring this interlocutory appeal pursuant to section 16–12–102(2), 8A C.R.S. (1986), asking that we reject the determination of the trial court and reverse its order suppressing statements made to the police by the defendant. After examining the totality of the circumstances, the district court concluded that because the defendant was interviewed by the police for the purpose of obtaining a confession and because the defendant reasonably believed he was not free to leave, the defendant was subjected to a custodial interrogation. For these reasons, and due to the fact that the police failed to advise the defendant of his *Miranda*[1] rights, the district court granted the defendant's motion to suppress. We find sufficient evidence to support the trial court's determination that defendant's statements were made in the

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

course of a custodial interrogation, and accordingly we affirm.

## I.

On April 10, 1992, the defendant below, Leslie Benjamin LaFrankie (LaFrankie), was questioned by two Longmont police detectives regarding the theft of a computer from LaFrankie's place of employment, High Tech Manufacturing (High Tech). The detectives, Lee Brian Scott and Pat Goeke, singled out LaFrankie for questioning based on information provided by management personnel at High Tech who suspected that LaFrankie had committed the theft because LaFrankie had access to the computer and had made suspicious statements to High Tech personnel.

The detectives arrived at High Tech at about 3:00 p.m. and spoke briefly with High Tech's management personnel, including its president. After meeting with the police officers, a High Tech manager was dispatched to escort LaFrankie, who was working on the production floor, to the main administrative area where the detectives were waiting in an area just outside the president's office. Upon LaFrankie's arrival, the detectives identified themselves and, in the presence of High Tech's management staff, asked LaFrankie if he "had a few minutes to talk." LaFrankie, stating that he wanted to get the matter straightened out, agreed to meet with the officers.

Still in the presence of the management staff, the detectives were directed to the president's office so that they could speak privately with LaFrankie. Officer Scott described the office as "very large" (fifteen feet by fifteen feet) and "well-lit." The detectives closed the office door and began their questioning.[2] One detective sat in a chair next to LaFrankie and the other sat about six feet away. Both detectives were armed but no weapons were visible. Officer Scott began the interview by explaining to LaFrankie that people frequently made mistakes and that the best thing to do was to try and rectify the mistake once "you realize your error." Officer Scott stated

that he believed LaFrankie had knowledge of the recent computer theft because LaFrankie had made statements regarding the theft before anyone else at the plant, except the president and general manager, knew about the incident. LaFrankie denied knowing anything about the whereabouts of the stolen computer. Officer Scott then asked LaFrankie if he would consent to a search of his house. LaFrankie said he would allow such a search and admitted that the officers would find a computer there, but said he did not believe that the computer at his house was the one stolen from the office. In apparent disbelief, Officer Scott told LaFrankie that he was acting "as nervous as a cat on a hot tin roof." LaFrankie then explained he was nervous because he had recently purchased a computer from a garage sale for $200 and it was possible that the computer he purchased was the one that had been stolen from the plant. Officer Scott again indicated disbelief at LaFrankie's story and told LaFrankie he thought he was lying. The majority of the interview was conducted in a similar fashion. For example, Officer Scott told LaFrankie not to worsen his mistake by lying; that LaFrankie would fail a polygraph test because he was lying; that LaFrankie had "a big bright sign on [his] forehead that says you made a mistake here"; that LaFrankie's story was too coincidental to be believed; that LaFrankie looked nervous and sweaty—as if he were lying; that LaFrankie could be used as a "poster boy for lying"; and that LaFrankie had insufficient funds in his checking account to purchase a computer for $200 cash. Nonetheless, LaFrankie steadfastly maintained his innocence through most of the interrogation.

However, after about thirty minutes of this type of questioning, LaFrankie confessed to having stolen the computer. In the course of the closed-door interview, LaFrankie was never informed that he was free to leave or that he was not in official custody. Neither Officer Scott nor Officer Goeke advised LaFrankie of his *Miranda*

---

**2.** The interview was tape-recorded without LaFrankie's knowledge. The tape and a transcript of the interview were admitted into evidence at the suppression hearing.

rights before or during the interview. Immediately before he confessed, however, LaFrankie was informed that if he admitted his participation he would not be arrested and put in jail that night, but that a felony summons would be issued in six weeks if charges were to be filed against him. After confessing to the theft, LaFrankie led the detectives to his home and allowed them to search his home to recover the stolen computer.

LaFrankie was charged with theft of a thing of value of $300 or more, in violation of section 18–4–401(1)(a), 8B C.R.S. (1986). On May 27, 1992, he was served with a summons to appear. He subsequently filed a motion to suppress his confession and the evidence obtained as a result of his April 10 interview with Officers Scott and Goeke. After a hearing on November 30, 1992, the district court granted LaFrankie's motion to suppress, finding that LaFrankie was subjected to a custodial interrogation without having been advised of his *Miranda* rights. We affirm the order of the district court granting LaFrankie's motion to suppress.

### II.

Under *Miranda v. Arizona,* 384 U.S. 436, 444, 478, 479, 86 S.Ct. 1602, 1612, 1629, 1630, 16 L.Ed.2d 694 (1966), evidence obtained as the result of a custodial interrogation may not be used against a defendant unless, prior to questioning, the defendant is warned that he has the right to remain silent, that any statement he makes may be used as evidence against him, that he has the right to have an attorney present, and that he has the right to have an attorney appointed for him if he cannot afford one. *See Jones v. People,* 711 P.2d 1270, 1275 (Colo.1986) (statements made during custodial interrogation are admissible only if defendant was given a *Miranda* advisement). Here, there is no dispute that LaFrankie was not advised of any of these rights. Thus, if the interview in question constituted "custodial interrogation," the evidence obtained as a result of the interview must be suppressed. *People v. Horn,* 790 P.2d 816 (Colo.1990).

"Interrogation" refers to words or actions "on the part of the police officer that the officer 'should know are reasonably likely to elicit an incriminating response from the suspect.'" *People in Interest of J.C.,* 844 P.2d 1185, 1189 (Colo. 1993) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980)). Here, it is undisputed that the interview in question was designed to elicit incriminating information from LaFrankie. Thus, the only question is whether the interrogation was custodial in nature.

Custody is not limited to those situations in which a formal arrest has taken place, but also includes those situations where the person interrogated "has been significantly deprived of his freedom of action." *People v. Trujillo,* 784 P.2d 788, 791 (Colo.1990). An interrogation is custodial if a reasonable person in the suspect's position would believe that he is deprived of his freedom of action in any significant way. *Horn,* 790 P.2d at 818; *accord People v. Cleburn,* 782 P.2d 784, 786 (Colo.1989). In determining whether a reasonable individual in the same situation would feel significantly deprived of his freedom of action, a court must consider the totality of the circumstances surrounding the interrogation, including the following factors:

> the time, place and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and general demeanor; the length and mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions.

*People v. Thiret,* 685 P.2d 193, 203 (Colo. 1984), *quoted in Horn,* 790 P.2d at 818 and *Trujillo,* 784 P.2d at 791.

The issue of custody is "essentially a factual question that involves a trial court's assessment of the credibility of witnesses and a weighing of their testimony." *Trujillo*, 784 P.2d at 792. Our role on appeal, therefore, is to "determine whether the trial court's findings of historical fact are adequately supported by competent evidence and whether the court applied the correct legal standard to these findings in resolving the issue before it." *Id.* A trial court's findings of fact will not be reversed on appeal when supported by competent evidence and when the trial court applied the correct legal standard. *Horn*, 790 P.2d at 818.

In the instant case, the People allege that the district court focused on the interviewing detectives' desire to extract a confession, to the exclusion of other factors which should have been considered as part of the "totality of the circumstances." As evidence that the district court erroneously based its finding of custody on the detectives' admitted desire to elicit a confession, the People point to the following passage from the court's order:

> [T]he encounter indicates to the Court that since the purpose of the interview was to get the defendant to confess, that that is what custodial interrogation is about and that is what Miranda is about. If you are going to interview somebody

who you are going to try to get a confession from, you at least have to advise them of their rights. [O]therwise Miranda doesn't mean anything.

We agree that this excerpt from the district court's order, when read alone, may be misleading since it could be interpreted to require a *Miranda* advisement whenever the purpose of an interrogation is to gain a confession.[3] The court's order, however, clearly sets forth the standard established by our precedent for determining whether the defendant was subjected to a custodial interrogation, i.e., that "a reasonable person in the defendant's position would have considered himself deprived of his freedom of action in a significant manner during a police interrogation." Moreover, the court's conclusion that the interrogation was custodial is based on factors other than the motivation behind the detectives' questioning of LaFrankie. In reaching its decision, the court focused on the totality of the circumstances surrounding the interview, including the "accusatory tone" used by the detectives[4] and the fact that the detectives never told LaFrankie that he was free to leave. Additionally, the court noted that the interview took place at LaFrankie's place of employment; that the interrogation took place in the president's office in a 15-by-15 foot room;[5] that the

3. While the purpose of an encounter is one of the prominent factors which should be considered in determining if a reasonable person would feel deprived of his freedom of action in a significant way, *see Thiret*, 685 P.2d at 203, we do not today establish a *per se* rule whereby a *Miranda* advisement is required any time a police officer's actions are motivated by the desire to obtain a confession or other information from a suspect.

4. On at least ten different occasions the detectives expressed disbelief at LaFrankie's statements. At one point, Officer Scott told LaFrankie, "Listen to me, Ben. Don't blow smoke at me, cause I'm going to find out, okay." In another instance Officer Scott told LaFrankie, "you have a big bright sign on your forehead that says you made a mistake here." Additionally, Officer Goeke told LaFrankie "we could use you as a poster boy for lying."

5. Although the interrogation by Officers Scott and Goeke did not take place at the station house, there can be few places more intimidat-

ing or potentially coercive to an individual than one's place of employment. This is especially true when the employee is first confronted in the presence of senior management, escorted to the president's office, interviewed while the door is closed, and never informed that he is free to leave. *See, e.g., United States v. Carter*, 884 F.2d 368 (8th Cir.1989) (holding that a bank employee questioned by police in bank president's office was subjected to custodial interrogation); *United States v. Nash*, 563 F.2d 1166 (5th Cir.1977) (finding custodial interrogation where suspect was taken to security office at his place of employment by his supervisor, interrogated by an FBI agent for 45 minutes with the office door closed, and was not informed that he had the right to leave the office); *United States v. Phelps*, 443 F.2d 246 (5th Cir.1971) (interrogation custodial where police questioned suspect at his place of business); *cf. United States v. Dockery*, 736 F.2d 1232 (8th Cir.1984) (police questioning of defendant at place of employment not custodial where defendant initiated interview and was told that she did not

only people in the room were the two police officers and LaFrankie; that the interview lasted for thirty minutes; that LaFrankie was accused of lying on several occasions; that LaFrankie's statements were "not volunteered"; and that LaFrankie was told he would fail a potential polygraph test.

We hold that this evidence is competent to support the order of suppression. Our decision is supported by *People v. Horn,* 790 P.2d 816 (Colo.1990), where we found the evidence of custodial interrogation sufficient to support the trial court's suppression order. As in the instant case, in *Horn* we noted the significance of the following facts: the interview was "accusative from the outset" (the defendant was accused of lying at least five times); during the course of the interview the defendant was urged to take a polygraph exam and encouraged to confess for the therapeutic value of the confession; the interview was conducted in an 8-by-12 foot room; the interview lasted for about thirty minutes; only the interrogating officer and defendant were present; and the sole purpose of the questioning was to obtain a confession from the defendant. *Id.* at 818–19. Additionally, unlike the instant case, the defendant in *Horn* was "repeatedly told that he was free to leave." [6] *Id.*

Finally, we believe that the district court applied the correct legal standard in resolving the case before us. At the outset of its order the court stated that the standard for determining custodial interrogation is whether "a reasonable person in the defendant's position would have considered himself deprived of his freedom of action in a significant manner," almost a verbatim restatement of the standard utilized in *Horn,*

*Trujillo,* and *Cleburn. See* discussion *supra,* pp. 704–705. And in concluding that LaFrankie was in custody, the court stated as follows:

> I mean there needs to be a time when a person is advised of their rights. You don't need to do it when you are investigating and you are asking questions and you are trying to figure out what is going on. *You don't need to do it if the person can walk away from you and the objective test is whether the person can figure that out.* In this case, the Court believes there was custodial interrogation.... *The Court has found that he was in custody and ... he was not aware he was free to leave.*

(Emphasis added). Thus, it appears that the court was well aware of the proper legal standard and correctly applied that standard to the totality of the circumstances in making its determination.

### III.

In summary, we agree with the district court that LaFrankie was subjected to custodial interrogation, without having been advised of his rights pursuant to *Miranda.* The district court considered the totality of the circumstances, including the purpose of the interview, the words used by the officers, the setting and duration of the interview, and the fact that LaFrankie was never informed that he was free to leave the interview, and, in doing so, found that the interrogation of LaFrankie was custodial. In reaching this conclusion, the court applied the correct legal standard, i.e., whether a reasonable person in the suspect's position would feel significantly deprived

have to answer any questions, that she was not under arrest, and that she was free to leave at any time). While the place of interrogation is significant, it is not controlling. *See generally* 1 Wayne R. LaFave and Jerold H. Israel, Criminal Procedure § 6.6 (1984) (questioning has been held to be noncustodial where it occurred at a place of employment, however the circumstances of the particular case need to be carefully assessed; police interviews were held to be custodial where an employee was marched off to a security office of his employer, or where a suspect was put into a police-dominated situation).

6. In *Horn,* the interview took place at the police station. Although this fact certainly supports a finding of custody, it is not conclusive. *United States v. Hudgens,* 798 F.2d 1234 (9th Cir.1986); *Graham v. State,* 535 N.E.2d 1152 (Ind.1989); *State v. Perkins,* 444 N.W.2d 34 (S.D.1989). Moreover, in *Horn,* it does not appear that either the district court or this court emphasized the location of the interview more than any other factor in determining the existence of custodial interrogation. *Horn,* 790 P.2d at 818–19.

of his or her freedom of action. Thus, we affirm the order of the district court suppressing statements and evidence obtained as a result of the April 10 custodial interrogation of the defendant.

MULLARKEY, J., dissents.

ROVIRA, C.J., and VOLLACK, J., join in the dissent.

Justice MULLARKEY dissenting:

I respectfully dissent.

The majority holds that the trial court's suppression of statements and evidence obtained as a result of the interview by the police of the defendant on April 10, 1992 is appropriate because the trial court correctly found that the defendant was subjected to a custodial interrogation without having been advised of his *Miranda*[1] rights. I disagree with the majority's conclusion. The trial court's excessive reliance on the "accusatory" state of mind of the interviewing officers in its determination that the defendant was in custody, combined with what the majority opinion accurately describes as the court's "misleading" view of *Miranda*, demonstrate that the trial court did not correctly apply the appropriate legal standard to the findings of fact. I would reverse and remand with directions to apply the correct legal standard for determining when a police interrogation is custodial in nature.

### I

The record in this case reveals that when officers Scott and Goeke asked the defendant if he would speak with them, the defendant agreed and stated that he wanted to "get the matter straightened out." The officers then interviewed the defendant in the company president's office for approximately thirty minutes. During that time, the defendant was not advised of his *Miranda* rights nor was he informed that he was either under arrest or free to leave. When the defendant asked the officers what would happen if the computer at his house was the one which was stolen, he was informed that he would not be taken into custody, but that a felony summons would be issued in about six weeks. The defendant later testified in the suppression hearing that he felt compelled to remain in the office with the police officers for two reasons: first, because of the general intimidation caused by the presence of two police officers, and second, because company management wanted him to speak with the officers.

The trial judge's order describes the issue in this case as whether or not the defendant was in custody at the time of the interview. The order then lists several factors weighed by the court in deciding the custody issue, with special emphasis upon the fact that the officers spoke in an "accusatory" tone and that they repeatedly expressed to the defendant that they believed him to be lying. In the trial court's view, it was "clear from the tone of the interrogation that they have already come to the conclusion that he is the person who did it." After stating that "the purpose of the interview was to get the defendant to confess, that that is what custodial interrogation is about and that is what *Miranda* is about," the court concluded that there was custodial interrogation and that the statements should be suppressed.

Contrary to the impression generated by the majority opinion, the trial court's order does not end there. Rather, the order proceeds to discuss in detail the separate issue of whether the defendant's responses during the interview were voluntary, that is, whether they were the product of coercion or threats by the police. The trial court made several findings of fact on this issue:

*The Court doesn't believe that there were threats made* in the sense of consequences that would occur to the defendant if he didn't tell the officers what they wanted to hear. There were statements of truth made and the Court doesn't believe that statements of truth create involuntary statements on behalf of the defendant. The *officers are telling the truth when they say that, "it's*

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*probably going to be easier on you if you admit....*" There are certainly no overt threats or promises. *The style used by the questioners was an approach which was low-keyed,* in the Court's view, in the sense of certainly there isn't a beating or yelling or all of those kinds of things that could have happened.... The technique was a *technique which was fairly low key and that is not going to be calculated to over[bear] somebody's will* as well as there is no evidence before the Court that would indicate that the defendant's physical or mental condition was utilized in any inappropriate manner.... All of those factors put together, the totality of the circumstances lead the Court to the conclusion that the statements are not involuntary ... and, therefore, the *Court does not believe that the statements were the product of involuntary interrogation.* (emphasis added)

The trial court order does not attempt to reconcile its apparently conflicting descriptions of the interview: on the one hand, the trial court found the conversation was highly "accusatory" when viewed as a custody question, yet, on the other hand, it found that the same conversation involved only true statements, was "low key" and was not "calculated to over[bear] somebody's will" when viewed as a voluntariness question.

## II

The test for determining whether a person is in a custodial setting is "whether a reasonable person in the suspect's position would consider himself deprived of his freedom in a significant way" during a police interrogation in which the defendant was exposed to the risk of self-incrimination. *People v. Probasco,* 795 P.2d 1330, 1334 (Colo.1990); *People v. Milhollin,* 751 P.2d 43, 49 (Colo.1988). A court must examine the totality of the circumstances on a case-by-case basis to determine whether the *Miranda* protections apply. *People v. Wallace,* 724 P.2d 670, 673 (Colo.1986); *People v. Thiret,* 685 P.2d 193, 203 (Colo.1984). While courts are to consider factors such as the purpose of the encounter and the tone of voice and general demeanor of the interviewing officer, *id.* at 203, we have held that the police officer's subjective state of mind is not an appropriate standard for determining whether an individual has been deprived of his freedom of movement in a significant way. *Wallace,* 724 P.2d at 674; *People v. Black,* 698 P.2d 766, 768 (Colo.1984); *People v. Johnson,* 671 P.2d 958, 961 (Colo.1983).

Although the trial court, at the outset of its order, correctly states this objective test for deciding whether the defendant was in custody, the remainder of the order raises serious doubts as to whether the court correctly applied that test in this case. First, the court was clearly laboring under the false assumption that custody is triggered for *Miranda* purposes whenever a police interview is designed to elicit a confession.[2] The problem with such a view of *Miranda* is that it shifts the focus of the custody inquiry from the objective test of what a reasonable person in the defendant's situation would believe, to a subjective inquiry, previously rejected by this court, into the state of mind of the interviewing officers. *See, e.g., Black,* 698 P.2d at 768; *People v. Corley,* 698 P.2d 1336, 1339 (Colo.1985) (finding no custodial interrogation despite the fact that the investigating officer "focused" on the defendant as a suspect).

The majority opinion finds the trial court's "misleading" view of *Miranda* harmless in light of that court's apparent

---

**2.** The relevant passage of the trial court's order reads as follows:

The Court has a transcript of the investigation and interrogation and the Court's conclusion ... is that the officers were there to get the defendant to tell them that he stole this computer. That is what this is about.... The Court's view of the encounter indicates to the Court that since the purpose of the interview was to get the defendant to confess, that that is what custodial interrogation is about and that is what *Miranda* is about. If you are going to interview somebody who you are going to try to get a confession from, you at least have to advise them of their rights. That is what *Miranda* is about, otherwise, *Miranda* doesn't mean anything.

reliance on other factors. The record reveals otherwise. The majority, for example, points out that the trial court clearly considered the "accusatory tone" of the interview as a key factor in its decision. The trial court order, when read in its entirety, reveals, however, that while the police officers communicated their belief that the defendant was lying to them, they did so in a "low-keyed" manner. Moreover, the officers followed such accusatory statements with what the trial court deemed to be "statements of truth," such as that the defendant would benefit from being honest with the police. The trial court described the interview technique as a "soft approach" that was not "calculated to over[bear] sombody's will." Finally, unlike in *People v. Horn*, 790 P.2d 816 (Colo. 1990), where the interviewing officer informed the defendant that charges would be filed against him regardless of the defendant's responses, the record here reveals that despite the police officers' accusatory tone, LaFrankie was told that he would not be taken into custody "unless he committed a murder."

The trial court's focus on the "accusatory" tone and content of the interview in its analysis of the custody issue, when contrasted with its approval of the officers' "soft approach" under its voluntariness analysis, suggests that the trial court's misreading of *Miranda* fatally infected its reasoning in this case. That is, the trial court appears to have decided the custody issue based almost exclusively upon its conclusion that the police officers intended from the outset to procure a confession. The majority, however, cites several other "factors" mentioned in the order as examples of the trial court's correct application of the objective custody test. For example, the majority points to the fact that the trial court described the interview as transpiring in the president's office in a fifteen-by-fifteen foot room. While the majority chose to view that fact as highly relevant to the custody decision, finding "few places more intimidating or potentially coercive to an individual than one's place of employment," maj. op. at 706, n. 5, there is no indication anywhere in the record that the trial court placed a similar gloss on the office dimensions.[3] Indeed, the majority's assumption that one's work place is somehow inherently "intimidating" and "potentially coercive" is a false generalization and not an accurate statement of the law.[4]

Moreover, the majority opinion omits to mention the fact that the defendant testified that he remained in the office with the police largely due to the fact that the company managers for whom he worked asked him to cooperate with the investigation. Where normal employment obligations give rise to restrictions on an employee's freedom to move, such restrictions will not in themselves support a finding that the employee is in custody. *Probasco*, 795 P.2d at 1334–1335; *accord Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210,

---

3. The majority emphasizes the factual similarities between this case and *Horn*, citing, among other things, the dimensions of the interview room in each case. Upon closer inspection, however, the two cases are distinguishable in important ways. For example, the majority cites the eight-by-twelve foot dimensions of the room in *Horn* as indicative of the fact that the trial court in this case must have found the fifteen-by-fifteen foot dimensions relevant in its analysis of the custody issue. The majority fails to mention, however, some key facts in *Horn* that distinguish it from the case at hand: in *Horn*, the trial court specifically pointed out that the eight-by-twelve foot room was "windowless" and "located in a secured area of the basement of the police station." *Horn*, 790 P.2d at 819. No such additional information is provided in the trial court order in this case.

4. The relevant federal precedent rejects such a sweeping view of the employment context in custody analysis:

> The place where an interrogation takes place does not conclusively establish the presence or absence of custody. A deprivation of freedom may take place at one's home as well as at the police station. *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). By the same token, an interrogation at the police station may be noncustodial. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).... Determining if there has been a deprivation of freedom entails something more than simply identifying the place of interrogation.

*United States v. Jones*, 630 F.2d 613, 615 (8th Cir.1980), *quoted in United States v. Carter*, 884 F.2d 368, 371 (8th Cir.1989).

104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) ("Ordinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers."); *United States v. Dockery*, 736 F.2d 1232 (8th Cir.), *cert. denied*, 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 129 (1984) (finding a bank employee not in custody when ordered by her employer to accompany F.B.I. agents to an office as part of an investigation into bank embezzlement). In this case, the defendant consented to speaking with the police at the request of his employer, and a reasonable employee in the defendant's situation would have believed that he was "simply following the orders of a superior in his place of employment." *Probasco*, 795 P.2d at 1334. As such, he would not be in custody for *Miranda* purposes by virtue of his belief that his employer expected him to cooperate.

Finally, the majority cites other facts mentioned in the order, such as the thirty minute duration of the interview and that the only people present at the interview were the defendant and the two police officers, maj. op. at 707, to support its view that the trial court correctly applied the objective custody test. Unfortunately, however, such facts are not analyzed or commented upon in the trial court order as weighing either for or against a determination that the interrogation was custodial.[5] Rather, the trial court's only explicit analysis of specific facts for purposes of custody determination can be found in two instances: first, when the court explains that the police officers' statement to the defendant that he would not be taken into custody unless he committed a murder "weighs against finding that he is in custody," and second, when the court erroneously states

that custodial interrogation is triggered by police intent to procure a confession.

### III

In summary, the record fails to support the conclusion that the trial court applied the correct legal standard to the facts in this case. Because I believe the trial court did not apply the correct legal standard, it is not necessary to reach the issue of whether or not the trial court's decision to suppress the relevant statements was "adequately supported by competent evidence." *People v. Trujillo*, 784 P.2d 788, 792 (Colo. 1990). The various "factors" cited by the majority as proof that the court correctly applied the appropriate test are overshadowed by the trial court's erroneous view of *Miranda*. The record shows that the trial court was more concerned with the subjective state of mind of the police than what a reasonable person in the defendant's situation would have believed. The only factors upon which the trial court undisputedly relied in making its custody determination were the facts that the police intended from the outset to procure a confession and that the police spoke to the defendant in an "accusatory tone." Those two factors, by themselves, cannot support a finding that the interrogation was custodial in nature.

For the foregoing reasons, I respectfully dissent.

I am authorized to say that ROVIRA, C.J. and VOLLACK, J., join in this dissent.

---

**5.** Once again, *Horn* provides an important contrast to this case. In *Horn*, for example, the trial court explained that the thirty-minute duration of the interview was significant "because of the highly confrontational nature of the encounter." *Horn*, 790 P.2d at 819. In light of the "soft approach" taken by the police in the present case, the relevance of the thirty-minute duration is at best unclear.