The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Johnathan Holden JORDAN, Defendant–Appellee.

No. 94SA401.

Supreme Court of Colorado, En Banc.

March 20, 1995.

Robert R. Gallagher, Jr., Dist. Atty., Steve Lee, Chief Deputy Dist. Atty., Eighteenth Judicial Dist., Englewood, for plaintiff-appellant.

Clayton and Stone, L.L.C., April Bennett Stone, Boulder, Cherner & Blackman, Philip A. Cherner, Barbara Blackman, Denver, for defendant-appellee.

Justice VOLLACK delivered the Opinion of the Court.

The People bring this interlocutory appeal to challenge the district court's order suppressing a statement made to police by the defendant, Johnathan Holden Jordan (the defendant). The district court found that, although the defendant voluntarily waived his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he did not do so knowingly and intelligently. We find that the record does not support the district court's suppression of the defendant's statement. We therefore reverse the suppression order and remand the case for further proceedings.

1. The information charged a violation of the following statutory provisions: § 18–3–102(1)(a), 8B C.R.S. (1986) (murder in the first degree); § 18–3–102(1)(b), 8B C.R.S. (1994 Supp.) (felony murder); § 18–2–201, 8B C.R.S. (1986 & 1994 Supp.) (conspiracy to commit first-degree murder); § 18–4–302(1)(b), 8B C.R.S. (1986) (aggravated robbery); § 18–4–409(2), 8B C.R.S. (1986 & 1994 Supp.) (aggravated motor vehicle theft in the first degree); § 18–2–201 (conspiracy to commit aggravated robbery); § 18–4–401, 8B

## I.

On the evening of March 29, 1994, John Leonardelli was stabbed to death in an Aurora, Colorado, parking garage, during the course of a robbery. Based on information received from several witnesses, the Aurora police department arrested the defendant on March 30, 1994, for his involvement in the murder. The defendant was charged by information with first-degree murder, felony murder, conspiracy to commit murder, aggravated robbery, conspiracy to commit aggravated robbery, aggravated motor vehicle theft, theft, and mandatory sentencing for a crime of violence.[1]

On August 15, 1994, the defendant filed a motion to suppress an inculpatory statement made to police shortly after his arrest, on the ground that the statement was made involuntarily and that it was taken in violation of the defendant's rights under *Miranda.* The district court held a hearing on the motion to suppress, at which the following facts were established.

On March 30, 1994, sometime around midnight the day after the murder, the defendant was taken to the Aurora police department, and was fingerprinted and booked. The defendant was placed in a holding room in the Aurora police department at approximately 2:00 in the morning on March 31, 1994. He was later escorted to an interview room in the detective bureau by an Aurora police officer and an Aurora police department homicide detective, Detective Dan Dailey. Detective Dailey provided the defendant with coffee and cigarettes, and began to interview him approximately two hours later.[2]

At the beginning of the interview, Detective Dailey advised the defendant that he was

C.R.S. (1986 & 1994 Supp.) (theft); and § 16–11–309, 8A C.R.S. (1994 Supp.) (mandatory sentencing for a crime of violence).

2. Detective Dailey's interview of the defendant was audiotaped in its entirety, and was later transcribed. A tape recording of the defendant's statement was admitted into evidence, as was a copy of the transcription of the tape recording.

a police officer and that he wanted to question the defendant "about first degree murder." Detective Dailey proceeded to advise the defendant of his rights under *Miranda.* Detective Dailey produced a standard advisement of rights form, and asked the defendant to follow along as the rights were read to him. After each of the rights was read to the defendant, Detective Dailey asked the defendant if he understood, and the defendant said "Yes." Additionally, the defendant signed his initials on the advisement form, indicating that he understood each of his rights. Detective Dailey then asked the defendant: "Having these rights in mind, do you wish to talk to us now?" The defendant answered affirmatively, wrote the word "yes" as the answer to the same question on the advisement form, and signed his signature on the advisement form.

Before Detective Dailey began to question the defendant about the murder, the detective ascertained that the defendant had a tenth-grade education, and that he could both read and write in the English language. The detective also questioned the defendant about his recent drug or alcohol use. The defendant said that the last time he had marijuana and alcohol was a couple of days prior to the interview. Finally, the defendant said that no one had made any threats or promises to him to cause him to talk to the police.

Detective Dailey interviewed the defendant for approximately one and one-half hours. The defendant initially told Detective Dailey that, although he was on both the second and third floors of the parking garage the evening the murder took place, he and a companion named Tom were just "passing through" the garage. The defendant said that he heard about the murder later the next day on the news.

When Detective Dailey confronted the defendant with the fact that the police knew of the defendant's involvement in the murder from an interview with the defendant's roommate, the defendant said: "I'll tell you the whole story, the truth now. All right." The

defendant eventually confided to Detective Dailey that he and a person named Jeff had gone to the parking garage to steal a car.[3] He said that they saw a white Jaguar, and waited in a stairwell near the Jaguar for the owner of the car to appear.[4]

As the victim came into the parking lot and walked towards the Jaguar, the defendant said that he hit him on the head. The victim struggled, and then the defendant saw Jeff stab the victim with a knife a number of times. According to the defendant, after the stabbing, the two men took the victim's watch, bracelet, ring, and keys, and then they got into the Jaguar with Jeff driving, and drove out of the garage.

Jeff and the defendant drove to an interstate highway, and proceeded to an apartment complex, where they parked and left the Jaguar. The defendant told Detective Dailey that he ran with Jeff to a bus stop, and took the bus to the Aurora mall. From the mall, the two men got on another bus. The defendant said that he rode the bus to a stop near his apartment, and went home.

After the prosecution presented evidence at the suppression hearing concerning the defendant's arrest and subsequent statement to the police, the defendant presented evidence attempting to show that the waiver of his rights was not voluntary, knowing, or intelligent. The defendant testified on his own behalf, and called one other witness, a psychiatrist named Dr. Robert Fairbairn. In his testimony, the defendant said that he slept for a total of about four and one-half hours the day before he was arrested. Normally, the defendant said, he slept between ten and twelve hours per day. The defendant also testified that earlier on the day of his arrest, he consumed malt liquor, and smoked some marijuana either the day before or the day of the arrest.

The defendant said that he remembered Detective Dailey telling him that he had certain rights under *Miranda.* He also said that he remembered Detective Dailey telling

---

3. The defendant was charged with a co-defendant.

4. During the investigation, the police determined that the Jaguar belonged to John Leonardelli, the victim.

him that he had a right to remain silent, but said that he thought he would have to talk to the detective sooner or later. The defendant testified that he understood that he could have a lawyer with him in court, but not during the questioning, and that he thought he would have to pay for the lawyer. He said that if he had known he could have had a lawyer during the time the detective was talking to him, he would have asked for one. On direct examination, defense counsel asked the defendant if he understood the word "appointed." He responded: "Same thing as given something, right?"

Regarding his educational background, the defendant said that he completed ninth grade, but that he received failing grades. The defendant testified that he was allowed to proceed to the tenth grade, but that he did not go to school all the time.

Additionally, the defendant said that he had experienced other problems with the law before his arrest for the homicide. The defendant remembered being charged as a juvenile for felony theft, and pleading guilty to the charge. The defendant admitted that he had been arrested before his arrest in this case, more than once. He also testified that he had spent time in jail on three separate occasions, and that he had been in front of a judge on a criminal case five or more times, either as an adult or a juvenile.

On cross-examination, the defendant remembered Detective Dailey telling him that anything he said could be used against him in a court of law, and he said that he understood it to mean that "whatever I told him he was going to bring it up in court." The defendant also testified on cross-examination that he never told Detective Dailey that he was tired or sleepy, that he did not want to talk to him, or that he did not understand his questions.

Dr. Fairbairn testified on direct examination that he met with the defendant two times for a total of approximately three and a quarter hours. He said that the defendant came from a troubled background, that he had below-average intelligence, and that he had a poor self-image. The psychiatrist further testified that the defendant had experienced a period of depression, and had been prescribed the antidepressant Prozac, but that the defendant had stopped taking the Prozac a few months before the homicide took place because he felt that it did not have any effect.

Dr. Fairbairn also said that the defendant had "serious difficulty" with abstract concepts, and that, in his opinion, the defendant did not understand his *Miranda* rights. Specifically, the psychiatrist said that the defendant had an inadequate understanding of the future impact of his answers. Dr. Fairbairn testified that he believed that, although the defendant did not understand his rights, the defendant told police that he understood his rights as a way of placating the police as an authority figure, in order to "get the whole thing over with." Dr. Fairbairn additionally noted that the defendant's behavior after the homicide—pawning the victim's bracelet, and telling his roommate of the homicide—showed that the defendant's judgment was impaired. Dr. Fairbairn testified that he asked the defendant why he talked to the police, and that the defendant responded: "I don't know, I just felt they'd find out anyways, I was busted anyway, I didn't want to take all the blame for it, I told them what my part was, what I did."

On cross-examination, Dr. Fairbairn conceded that it was possible that the defendant spoke to the police, and initially denied his involvement in the murder, because he did not want to admit what he had done, and because he was hoping to escape punishment. Specifically, the doctor testified that the defendant most likely said what he did to Detective Dailey

> [b]ecause he was tired, he wanted to get it over with. Also that he figured the police would be hearing very critical comments about him from the codefendant, from his roommate, from his mother, and he wanted to get his less incriminating version in before they heard the more incriminating version.

Dr. Fairbairn admitted that such behavior was an example of someone who is able to consider the consequences of his actions, and that "[t]o a degree" it was an example of someone engaging in abstract thought. Dr.

Fairbairn also testified that he believed that the defendant did understand that Detective Dailey was going to ask him questions about his involvement in the murder case.

In an oral ruling on November 8, 1994, the district court suppressed the defendant's statement, holding that the defendant did not voluntarily, knowingly, and intelligently waive his *Miranda* rights. In its findings, the district court found that the defendant had been sleep-deprived and on Prozac when he was interviewed by the police. The court also found that the *Miranda* advisement was a "very, very perfunctory type advisement." The district court concluded that, under the circumstances, the defendant's waiver was not a "voluntary waiver."

The next day, on November 9, 1994, the district court was asked to clarify its ruling. The court found that the defendant's waiver of his *Miranda* rights was voluntary, and not a result of coercive police conduct. Nevertheless, the court went on to find that the defendant's waiver was not knowing and intelligent because the defendant had "demonstrated an inability ... to appreciate and ... assimilate the consequences of making a statement and ... the ramifications of [that] statement."

The People then filed this interlocutory appeal to challenge the district court's order suppressing the defendant's statement.

## II.

■ The prosecution argues that the district court erred by applying an incorrect legal standard when it found that the defendant did not knowingly and intelligently waive his rights. According to the prosecution, the district court improperly focused on the wisdom of the defendant's decision to speak to the police, rather than whether the defendant understood the consequences of his waiver.[5] We find that, although the district court used the proper standard for determining whether the waiver was knowing and intelligent, the district court's decision is

not supported by the evidence in the record and must be reversed.

Under *Miranda*, before a person can be subjected to custodial interrogation by the police, he must be advised of the following rights: that he has a right to remain silent, that any statement he makes can be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *People v. Dracon*, 884 P.2d 712, 716 n. 8 (Colo.1994). If the *Miranda* advisement is not given, or if there is not a valid waiver of the rights contained in the advisement, any statement subsequently made to the police by the person interrogated is inadmissible in a criminal case against him. *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630; *Dracon*, 884 P.2d at 716.

■ The rights incorporated in the *Miranda* advisement may be waived, as long as the waiver is voluntary, knowing, and intelligent. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *People v. May*, 859 P.2d 879, 882 (Colo. 1993). The validity of the waiver involves a two-part inquiry. *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 856–57, 93 L.Ed.2d 954 (1987); *People v. Jiminez*, 863 P.2d 981, 984 (Colo.1993). First, the relinquishment of the rights must be voluntary, in the sense that it is an act of deliberate choice, and not the result of police intimidation, coercion, or other misconduct. *Spring*, 479 U.S. at 573, 107 S.Ct. at 856–57; *Jiminez*, 863 P.2d at 984. Second, the waiver must be made with full awareness of the nature of the rights abandoned, and the consequences of the decision to abandon those rights. *Spring*, 479 U.S. at 573, 107 S.Ct. at 856–57; *Jiminez*, 863 P.2d at 984. When a defendant challenges the introduction of his statement on the ground that it was obtained in violation of *Miranda*, the prosecution bears the burden of proving the waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986); *Jiminez*, 863 P.2d at 984. In coming to a determination

---

**5.** Although the defendant does not concede that his waiver was voluntary, the district court's ruling with respect to the voluntariness of the statement is not before us. The only issue on appeal is whether the district court erred in concluding that the defendant's waiver of his rights was invalid because it was not knowingly and intelligently made.

on the validity of a waiver, the court must consider the totality of the circumstances surrounding ·the custodial interrogation. *Jiminez,* 863 P.2d at 984.

In its initial ruling, the district court recognized that the issue before the court was

> whether [the defendant] can not only assimilate the *Miranda* warnings, but use them to protect himself. And that's the critical issue that's before the court.

> In other words, it's one thing for him to say, "I know on a superficial level what it means [the] right to remain silent, [but] what do I do with that right? I know I have a right to an attorney, [but] how do I exercise that right?"

In its clarified order the next day, the district court enunciated the correct standard for a determination of whether a waiver is knowing and intelligent: ·

> Now the second portion is that the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it and that is what . . . the real basis of the court's ruling was. . . .

The standard set forth by the district court is in keeping with our holdings in both *Jiminez* and *May* that a knowing and intelligent waiver is one made with a full awareness of not only the nature of the rights waived, but also the consequences of waiving those rights. *Jiminez,* 863 P.2d at 984; *May,* 859 P.2d at 882.

■ When reviewing the district court's suppression motion, we must determine whether the district court applied the proper legal standard to the facts of the case. *People v. LaFrankie,* 858 P.2d 702, 706 (Colo. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1663, 128 L.Ed.2d 379 (1994); *People v. Gennings,* 808 P.2d 839, 844 (Colo.1991). We must also determine on appeal whether the district court's factual findings are *adequately supported by competent evidence in the record. LaFrankie,* 858 P.2d at 706; *Gennings,* 808 P.2d at 844. This second inquiry necessarily involves an examination of the evidence before the district court, and a determination of whether the evidence adequately supported the district court's ulti-

mate legal conclusion on the constitutionality of the waiver of *Miranda* rights. *See Gennings,* 808 P.2d at 844. Accordingly, we will defer to the district court's findings only if they are adequately supported by evidence in the record. *See Gennings,* 808 P.2d 839, 847 (reversing the trial court's suppression order, in part because "the [trial] court's ruling on custody was not adequately supported in the record"); *People v. Mounts,* 784 P.2d 792, 797 (Colo.1990) (also reversing the trial court's suppression order, concluding that "the evidence in the record does not support the trial court's finding that [the defendant's] statement was involuntary").

Keeping this standard of review in mind, we find that, despite the fact that the district court recognized the appropriate standard for a knowing and intelligent waiver, the district court's application of the standard to the facts of this case was in error. We conclude that the district court's ruling is not supported by the record, and that the defendant had a sufficient understanding of his rights, and a sufficient understanding of the consequences of relinquishing those rights, so that his waiver was a knowing and intelligent one.

First, the record does not support the district court's finding that the defendant's advisement was "very, very perfunctory." The record indicates that Detective Dailey gave the defendant a written copy of the advisement form, read each right to him separately, and asked the defendant if he understood each right. The defendant acknowledged his understanding both verbally, and by writing his initials on the form next to each enumerated right. The defendant's advisement was as complete as *Miranda* requires it to be, including informing him that he had a right to remain silent, that what he said could be used against him in a court of law, that he had the right to talk to a lawyer, and have the lawyer present *during questioning,* that a lawyer would be appointed if he could not afford one, and that he could exercise his rights *at any time and not answer any questions or make any statements.* Then, at the conclusion of the advisement, the defendant acknowledged both verbally and by placing his initials on the correspond-

ing space on the form that he wished to talk to the police. Finally, the defendant signed the form. The defendant's behavior during the advisement indicates that he understood his rights, and that he agreed to talk to police notwithstanding those rights. Under *Miranda*, the police are not required to tell the defendant that it might be against his self interest to confess to the police.

Furthermore, the only evidence that the defendant was unable to understand his rights, other than the self-serving testimony of the defendant, was the testimony of Dr. Fairbairn. Dr. Fairbairn testified that, in his opinion, the defendant had difficulty with abstract concepts, and did not understand his *Miranda* rights. However, Dr. Fairbairn's testimony on direct examination was refuted by his concession on cross-examination that the defendant *was* capable of thinking abstractly and *did* understand the consequences of his actions. The defendant's ability to reason in an abstract way is borne out by the record.

A review of the defendant's interview with Detective Dailey and his testimony at the hearing on the motion to suppress indicates that he gave consistently appropriate answers to the questions asked of him. He said that he understood Detective Dailey's advisement to mean that the things he told police could be used against him in court, and that when someone is "appointed" with something, it means to be given something.[6]

■ The record reflects that the defendant was sufficiently capable of comprehending his rights, and waiving them. Dr. Fairbairn acknowledged that the defendant told him he talked to police because he "[did]n't know, [he] just felt they'd find out anyways, [he] was busted anyway, [he] didn't want to take all the blame for it." The defendant's response establishes that he knew full well that he was in trouble, and that, by getting his story to the police first, he might be able to extricate himself from the situation. Simply because the defendant's decision to talk to the police might be ill-advised does not mean that the defendant's decision was not knowingly or intelligently made.[7]

The record also shows that the defendant had the foresight to lie to Detective Dailey about his involvement in the murder, when he knew at the beginning of the interview that the detective intended to ask him about his involvement with "first degree murder." The defendant fabricated a story that he and another person, "Tom," were just passing through the garage. Not until the defendant was confronted by Detective Dailey with the information obtained from the defendant's roommate did the defendant say, "I'll tell you the whole story, the truth now."

Finally, the defendant was involved in the criminal justice system in the past, and appeared in front of a judge on at least five occasions. The defendant therefore had some experience with the court system, and was not completely naive about the criminal process.[8]

This case is therefore distinguishable from *People v. Jiminez*, 863 P.2d 981 (Colo.1993), and *People v. May*, 859 P.2d 879 (Colo.1993). In both those cases, we held that the record supported the district court's finding that the defendants did not knowingly and intelligently waive their rights under *Miranda*. In *Jiminez*, the defendant was a Native American, whose native language was Kickapoo. Nonetheless, when the police read him his rights, they read them to him in Spanish, a language in which his vocabulary was very

---

6. The record reveals that, although the defendant did not complete high school, he attended school at least until the tenth grade. Although Dr. Fairbairn testified that the defendant had a below-average intelligence, his conclusion was based in part on the defendant's inability to tell him what certain parables mean, and was not based on any written assessment of his IQ.

7. The record also does not support the district court's finding that the defendant was on the antidepressant Prozac when he gave his statement to police. The only testimony regarding Prozac was the testimony of Dr. Fairbairn, who said that the defendant told him he had stopped taking the medication months before the murder took place. In addition, there was no evidence that the medication would have affected the defendant's ability to comprehend his rights.

8. *See Gennings*, 808 P.2d at 844 (holding that, when the trial court rules on the voluntariness of a confession, one consideration is whether the defendant had prior experience with the criminal justice system).

limited. *Jiminez,* 863 P.2d at 985. There was also testimony in that case that the concept of a "right" was not even incorporated in Jiminez's native Kickapoo language, that he functioned at the *six-year-old level,* and that he had no formal education whatsoever. *Id.* at 982, 985. According to the testimony at the hearing on the motion to suppress his statement, Jiminez did not even understand the terms "lawyer" or "jury." *Id.* at 982.

Similarly, in *May,* we said that May's waiver of his rights was not knowing and intelligent because the record indicated that May was interviewed by police shortly after being airlifted to a hospital for treatment of injuries he suffered in a serious automobile accident. *May,* 859 P.2d at 883. While the police were interviewing May, he was drifting in and out of consciousness, and gave confused answers to questions asked of him. For instance, he did not know what day it was, where he was, where the accident had taken place, or who he was with in the car. *Id.* at 881–82, 883.

In contrast, the totality of the circumstances in this case demonstrates that the defendant recognized the seriousness of his predicament, that he understood both the meaning and extent of his rights, and that he knowingly and intelligently waived those rights. We find that the district court's ruling holding that the defendant's waiver was not knowing and intelligent is not supported by evidence in the record. Therefore, we reverse the ruling of the district court and remand the case for further proceedings.

KIRSHBAUM, J., dissents, and LOHR and SCOTT, JJ., join in the dissent.

Justice KIRSHBAUM dissenting.

This interlocutory appeal requires application of what we have heretofore recognized as the appropriate standard for interlocutory appellate review of trial court orders granting suppression motions in the course of criminal proceedings. We have on numerous occasions held that such a trial court order will not be overturned unless the trial court fails to apply the correct legal standard or unless the record fails to support the trial

court's factual findings. *See, e.g., People v. Trujillo,* 784 P.2d 788, 792 (Colo.1990). Both parties to this appeal have acknowledged the applicability of that standard of review to this appeal, and the majority purports to adopt it. Maj. op. at 1011, 1014, 1015, 1016–17. Because I am convinced that the record as a whole does support the trial court's factual findings, I respectfully dissent from the majority's contrary conclusion.

Of additional concern is the suggestion raised by the majority's mode of analysis and reflected by certain dicta in the majority's opinion that a *de novo* standard of appellate review should be applied to interlocutory appeals of trial court orders granting suppression motions in criminal cases. To the extent the majority purports to adopt this novel standard of appellate review without overruling our long-standing precedent, I also respectfully decline to join the opinion.

In this case the defendant filed a pretrial motion to suppress a statement he made to a police officer during custodial interrogation. The defendant alleged, *inter alia,* that assuming he was properly advised of his constitutionally protected rights to counsel and against self-incrimination, as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he did not knowingly and intelligently waive such rights. The trial court conducted an evidentiary hearing and granted the motion. The majority concludes that the trial court applied the correct legal standards in this case. Maj. op. at 1014, 1015. I agree with that conclusion. The majority also states that the trial court's decision is not supported by the evidence in the record. *Id.* at 1014, 1015, 1017. I disagree with that conclusion.

We have recognized that in considering a motion to suppress custodial statements "a [trial court] must engage in fact finding—a specific inquiry into the historical phenomena of the case—and law application, which involves the application of the controlling legal standard to the facts established by the evidence." *People v. Quezada,* 731 P.2d 730, 732 (Colo.1987); *see* H.P. Monaghan, *Constitutional Fact Review,* 85 Colum.L.Rev. 229, 235 (1985). It is also well established that when such a motion is filed the prosecution is

required to establish by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived such rights. *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986); *People v. Jiminez,* 863 P.2d 981, 984 (Colo.1993); *People v. May,* 859 P.2d 879, 882 (Colo.1993). Finally, a trial court must consider the totality of the circumstances in making its ultimate legal conclusions. *May,* 859 P.2d at 883; *see People v. Mounts,* 784 P.2d 792, 796 (Colo.1990) (voluntariness determined on the basis of the totality of circumstances).[1]

This court has long adhered to the following principles in reviewing trial court orders granting defendants' motions to suppress custodial statements:

> Our role as an appellate court is to review the record and determine whether the trial court's findings of historical fact are adequately supported by competent evidence and whether the court applied the correct legal standard to these findings in resolving the issue before it.

*Trujillo,* 784 P.2d at 792; *accord People v. LaFrankie,* 858 P.2d 702, 706 (Colo.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1663, 128 L.Ed.2d 379 (1994); *People v. Fish,* 660 P.2d 505, 509 (Colo.1983) (where adequate evidence exists in the record to support trial court's finding that the People failed to prove that defendant waived his *Miranda* rights, appellate court will not reverse); *People v. Medina,* 180 Colo. 56, 58, 501 P.2d 1332, 1332 (1972); *People v. Kelley,* 172 Colo. 39, 40, 470 P.2d 32, 33 (1970) (if trial court's findings on pertinent issues in a suppression hearing are supported by evidence in the record, a reviewing court must affirm); *cf. People v. Founds,* 621 P.2d 325, 328 (Colo.1981) (trial court's factual finding that defendant's statements were product of illegal interrogation is supported by the record and cannot be disturbed on review); *People v. Traubert,* 199 Colo. 322, 327, 608 P.2d 342, 346 (1980) (where evidence exists to support trial court's findings regarding voluntariness of a confes-

sion, the findings of the trial court shall not be disturbed on appeal); *People v. Parks,* 195 Colo. 344, 349, 579 P.2d 76, 79 (1978) (trial court's findings of fact regarding the voluntariness of a confession will be upheld on review if supported by adequate evidence in the record); *People v. Pineda,* 182 Colo. 385, 387, 513 P.2d 452, 453 (1973) (same); *Gould v. People,* 167 Colo. 113, 118, 445 P.2d 580, 582 (1968) (trial court's findings of fact and conclusions of law regarding voluntariness of confession which are substantiated by adequate evidence will not be reversed on appeal). Such deference to the fact finding authority of trial courts reflects our recognition that a trial court is in a unique position to determine the credibility of witnesses and to weigh conflicting evidence in determining historical facts. *Trujillo,* 784 P.2d at 792; *Fish,* 660 P.2d at 509 (an appellate court is in no position to weigh conflicting testimony presented to the trial court); *Traubert,* 199 Colo. at 327, 608 P.2d at 346; *Kelley,* 172 Colo. at 40, 470 P.2d at 33 (it is the function of the trial court, not the reviewing court, to weigh the evidence and make a finding on the pertinent issues at a suppression hearing); *People v. Scott,* 198 Colo. 371, 373, 600 P.2d 68, 69 (1979) (appellate court is in no position to weigh the conflicting testimony presented to the trial court). It is precisely because "[a] cold record is a poor substitute for live testimony" that we do not intrude upon the trial court's domain except in the clearest of cases. *Scott,* 198 Colo. at 373, 600 P.2d at 69.

During the suppression hearing in this case, the trial court accurately observed that the critical issue to be resolved was "whether [the defendant] can not only assimilate the *Miranda* warnings, but use them to protect himself." In its opinion the trial court thoroughly addressed conflicting testimony and matters of credibility. It also referred to evidence that could support factual determinations contrary to those found by the trial court. The trial court concluded, on the basis of its factual findings, that the prosecution did not sustain its burden of proving that

---

1. The majority acknowledges this standard, *see* maj. op. at 1014, although in describing the events that occurred during the suppression hearing the majority states that "the defendant presented evidence attempting to show that the waiver of his rights was not voluntary, knowing, or intelligent." Maj. op. at 1012.

the defendant knowingly and intelligently waived his constitutionally protected rights.

The majority, to the contrary, concludes that "the defendant had a sufficient understanding of his rights, and a sufficient understanding of the consequences of relinquishing those rights, so that his waiver was a knowing and intelligent one." Maj. op. at 1015. In reaching that conclusion, the majority has catalogued numerous evidentiary matters disclosed by the record and, in addition, the majority apparently has made inferences of credibility and has made its own factual findings in light of both conflicting and uncontradicted evidence. Such *de novo* review of the record is inconsistent with the standard of review we have heretofore embraced. Furthermore, whatever method is deemed appropriate for appellate review of trial court orders granting motions to suppress evidence in criminal proceedings, this court may not speculate on witness credibility or resolve evidentiary conflicts.

A description of the evidence in the record and a summary of the trial court's findings will prove helpful in resolving the issue before us. Three witnesses testified at the suppression hearing: Detective Dailey, Dr. Robert Fairbairn, and the defendant. In its order, the trial court repeatedly stated that it was required to consider the totality of the circumstances in determining whether the prosecution had satisfied its burden of proving that the defendant's waiver of his constitutionally protected rights was made knowingly and intelligently. Each of the trial court's factual findings is directly supported by the testimony of one of those three witnesses.

In reviewing Detective Dailey's testimony, the trial court concluded that the officer properly informed the defendant of the latter's constitutional rights and did not threaten, coerce, or intimidate the defendant. Because the trial court's ultimate determination was based on its findings of fact with respect to the defendant's state of mind during the custodial interrogation, review of Detective Dailey's testimony is not necessary.[2]

The trial court summarized the defendant's testimony as follows:

> [Jordan] stated that he knew he had a right of some sort to remain silent, but that he'd have to talk to the detective sooner or later, he didn't know to whom he could be silent.
>
> He said he knew he could have a lawyer but he didn't think so during questioning.
>
> Based on his experience he felt that his lawyer would appear for him in court. . . .
>
> He did not think that he could stop talking once he knew that Mr.—Detective Dailey was a police officer, felt that he had to keep on going and didn't apparently in his mind understand his right to terminate conversation at any time.
>
> . . . .
>
> On cross-examination it was made clear that the Defendant does have a degree of some level of organization in his thinking; however, it was never completely made clear to me whether he understood, as I said earlier, what this meaning of the right is and how you use the right, what it is and how he gets a lawyer then and there.

In addition to the evidence described by the majority,[3] the record contains additional testimony by the defendant. The defendant testified that he not only had very little sleep the night of his arrest but that when he was awakened prior to his interrogation he felt "tired and confused"; that he had a headache from alcohol which he had consumed that day

---

**2.** The majority concludes that the evidence with respect to the adequacy of Detective Dailey's advisement does not support the trial court's characterization of that advisement as being "very, very perfunctory." Maj. op. at 1015. That characterization, however, is immaterial to the trial court's conclusion that the people failed to establish that the defendant knowingly and intelligently waived his constitutionally protected rights.

**3.** As the majority notes, the defendant also testified that he normally slept for ten to twelve hours each day. Maj. op. at 1012. The majority opinion describes much of the defendant's testimony; by necessity the majority could not detail all of that testimony. However, because the majority concludes that the record as a whole does not contain evidence supporting the trial court's findings of fact, it is necessary to emphasize that the record contains evidence not alluded to in the majority opinion but relied upon by the trial court.

but that the "marijuana had calmed down"; that when he was attending school he had trouble with long words and concentration and did not presently know the meaning of the words "oath," "approximation," or "distinct"; that although the detective told him he had the right to remain silent, he "didn't know who [he] was supposed to remain silent to"; that he had appeared in court as a juvenile, had no prior arrests as an adult, and had never been questioned by a police officer before going to court; that he had never been given a *Miranda* advisement prior to the one given by Detective Dailey; and that he did not think that he could terminate the interview with Detective Dailey because he thought he "had to talk to him anyway."

Based on all of the evidence, the trial court found as matters of historical fact that the defendant was sleep-deprived at the time he was interrogated; that the evidence was conflicting with respect to possible alcohol or drug consumption which might have affected the defendant during the interrogation, but that these factors were not "critical in this determination"; that the defendant's education is "deficient by any definition"; that the defendant was on a "strong psychotropic drug" (Prozac) within six months of the time of his arrest; and that the defendant had prior experience with the criminal justice system.

The majority opinion also contains descriptions of much of Dr. Fairbairn's testimony. Maj. op. at 1012–13. In my view, the evidence summarized by the majority in itself fully supports the trial court's findings. However, the record also contains additional testimony by Dr. Fairbairn that the trial court considered in determining historical facts concerning the circumstances of the custodial interrogation of the defendant.

Dr. Fairbairn explained that he conducts forensic psychiatric examinations of how an examinee's mental processes are functioning. He stated that he utilized relatively routine questions to determine the mental status of an examinee, looking for possible psychosis or organic difficulties, testing the examinee's memory, and determining whether the examinee can think abstractly. Dr. Fairbairn testified that the defendant came from a "tragic

background"; that one of the defendant's earliest memories was of playing with a lighter, ultimately setting his house on fire and thus causing the death of his mother and two brothers; that this early trauma partially led the defendant to develop a poor self-concept; and that the defendant's defense mechanism to escape the pain of his self-contempt includes sleeping excessively and using marijuana and alcohol.

Dr. Fairbairn stated that in his expert opinion the defendant had an IQ of 85 or 90; the defendant was deficient in making decisions that have future rewards or distant goals behind the rationale of a decision; although *Miranda* warnings require an individual to assess his current circumstances and realize that how he answers will affect what happens to him in the future, the defendant has an inadequate understanding of that process; the defendant did not understand the phrase "the right" in that portion of the advisement stating that "you have the right to remain silent"; and the defendant did not understand the statement, "You can decide at any time to exercise these rights." Dr. Fairbairn also stated that in his expert opinion the defendant "rotely gave an affirmative answer" during the interrogation because "he was operating on autopilot" and just gave a "hostile authority figure"—Detective Dailey—what he wanted; the defendant's lack of sleep impaired his ability to understand his *Miranda* rights; the defendant's vague answers and contradictory stories indicate that he "didn't think that . . . he dare use silence, that he felt required to give an answer to the authority figure, whatever the question was"; and the defendant had a "seriously inadequate understanding of the consequences of his affirmative answers."

The majority deprecates and apparently disregards the defendant's testimony by characterizing it as "self-serving." Maj. op. at 1016. An appellate court may not ignore testimony in the record based upon that court's determination that such testimony is "self-serving"; such credibility evaluations are within the sole province of the fact finder. *Fish*, 660 P.2d at 509. In this case, the trial court expressly noted that it perceived a substantial difference in the demeanor of the

defendant during the latter's testimony at the suppression hearing in comparison to the defendant's demeanor during the interrogation session.[4]

The majority states that Dr. Fairbairn's conclusion "that the defendant had difficulty with abstract concepts and did not understand his *Miranda* rights" was "refuted" by the expert's testimony on cross-examination. Maj. op. at 1016. This court has not previously suggested that contradictory evidence, whether elicited by cross-examination of a single witness or introduced by means of testimony of other witnesses, does not constitute evidence in the record subject to trial court evaluation. Assessment of the credibility and probity of contradictory evidence should not be performed by an appellate court.

We have previously observed that the use of opinion testimony in a suppression hearing provides the court "potentially valuable assistance in understanding and evaluating a defendant's mental condition...." *Parks,* 195 Colo. at 348, 579 P.2d at 79; *see In re Estate of Painter,* 628 P.2d 124, 125 (Colo.App.1980) (issues of credibility of expert witness and probative effect of that testimony are reserved for a trial court, not an appellate court). Any alleged deficiencies or unreliability in an expert physician's testimony relate to the credibility and the weight to be afforded that opinion and may be explored through cross-examination and the introduction of opposing expert testimony. *Parks,* 195 Colo. at 348, 579 P.2d at 79.

As the majority recognizes, Dr. Fairbairn stated his opinions with respect to the defendant's ability to engage in abstract reasoning and the defendant's general level of intelligence. Maj. op. at 1013. The prosecution did not challenge Dr. Fairbairn's expertise. The trial court made the following pertinent statements with respect to Dr. Fairbairn's testimony:

> Dr. Fairbairn, who ... has testified on both sides of the aisle in terms of being he has been at one time a police or a DA's witness and a defense witness, that is during the course of his history, and it was never challenged in any way that he was anything other than an objective observer. Although there was plenty of opportunity to do it, the People didn't challenge that in any way.

The trial court properly considered all of Dr. Fairbairn's testimony on direct and on cross-examination. That testimony amply supports the trial court's finding that the defendant did not understand the *Miranda* warnings he received.

In my view the record amply supports the trial court's determinations of historical fact. Whether this or some other court could make different factual findings based on the evidence in the record has heretofore not been considered a component of our standard of appellate review of trial court orders granting suppression motions in criminal cases.

The analysis of the record employed by the majority in effect constitutes *de novo* appellate court evaluation of evidence and necessarily requires appellate court assessment of witness credibility and resolution of conflicting evidence.[5] Adoption of that mode of analysis would require this court to overrule countless decisions defining the appropriate standard of appellate review. The parties have not invited us to take such action in this case, and I am unprepared to do so.

The record fully supports the trial court's findings, and the trial court applied the correct legal standard. I would therefore affirm the trial court's order, and therefore respectfully dissent to the majority's opinion.

LOHR and SCOTT, JJ., join in this dissent.

---

4. An audiotape of the interrogation session was introduced in evidence by the prosecution.

5. Unlike a few other jurisdictions, Colorado appellate courts have no authority to find facts *de novo.* See *Ranola Oil Co. v. Corporation Comm'n of Okla.,* 752 P.2d 1116 (Okla.1988); *Neiman v. Common Sch. Dist., No. 95,* 232 P.2d 422 (Kan. 1951).